# IN THE UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff-Appellant,

*v.*

JULIEN GIRAUD, JR., JULIAN GIRAUD III, CESAR HUMBERTO PINA

Defendants-Appellees.

On Appeal from the United States District Court for the District of New Jersey, Nos. 1:24-cr-768, 2:25-cr-436 (Brann, C.J. (M.D. Pa.))

**BRIEF FOR APPELLEE CESAR H. PINA**

Gerald Krovatin
KROVATIN NAU LLC
60 Park Place, Suite 1100
Newark, NJ 07102
T: (973) 424-9777
F: (973) 424-9779
gkrovatin@krovatin.com

Abbe David Lowell
David A. Kolansky
Isabella M. Oishi
John P. Bolen
LOWELL & ASSOCIATES, PLLC
1250 H Street, N.W., Suite 250
Washington, DC 20005
T: (202) 964-6110
F: (202) 964-6116
ALowellPublicOutreach@
lowellandassociates.com

Norman L. Eisen
Joshua Kolb
DEMOCRACY DEFENDERS FUND
600 Pennsylvania Avenue S.E.
Suite 15180
Washington, DC 20003

T: (202) 594-9958
norman@statedemocracydefenders.org

---

# TABLE OF CONTENTS

**Page(s)**

INTRODUCTION ................................................................................7

STATEMENT OF THE CASE...............................................................9

   A.   Statutory Background..................................................................9

   B.   Factual Background....................................................................13

   C.   Procedural History.....................................................................14

SUMMARY OF ARGUMENT ............................................................15

STANDARD OF REVIEW .................................................................19

ARGUMENT ....................................................................................19

   I.   The FVRA DOES NOT ALLOW MS. HABBA TO SERVE AS ACTING U.S. ATTORNEY.......................................................................19

     A.   The Only "First Assistant" Eligible To Serve As Acting U.S. Attorney Under The FVRA Is The First Assistant At The Time The Vacancy Occurs...19

     B.   An Employee Who Will Never Have a Supervisor is Not a "First Assistant".......................................................................................38

     C.   The FVRA Prohibits a Former Nominee From Serving As First Assistant. 39

     D.   The Expiration of an Interim Appointment Under 546 Does Not Trigger the FVRA.......................................................................................44

   II.   THE ATTORNEY GENERAL CANNOT RELY ON A "SPECIAL ATTORNEY" STATUTE TO DELEGATE SUPERVISION OVER THE U.S. ATTORNEY'S OFFICE TO MS. HABBA. ........................................48

CONCLUSION ..................................................................................58

# TABLE OF AUTHORITIES

**Cases**

*Encompass Ins. Co. v. Stone Mansion Rest. Inc.*, 902 F.3d 147 (3d Cir. 2018)......58

*Girard Inv. Co. v. Comm'r of Internal Revenue*, 122 F.2d 843 (3d Cir. 1941).......21

*Arthrex, Inc. v. Smith & Nephew, Inc.*, 35 F.4th 1328 (Fed. Cir. 2022).................53

*Bd. of Trs. of Leland Stanford Junior Univ. v. Roche Molecular Sys., Inc.*, 563 U.S. 776, 792 (2011) .......................................................................................................23

*Bulova Watch Co. v. United States*, 365 U.S. 753, 758 (1961) ....................... 45, 46

*TRW Inc. v. Andrews*, 534 U.S. 19, 29 (2001)). ......................................................29

*Edmond v. United States,* 520 U.S. 651, 659 (1997), ...............................................9

*Gonzales & Gonzales Bonds & Insurance Agency Inc. v. U.S. Dep't of Homeland Sec.*, 107 F.4th 1064, 1078 & n.7 (9th Cir. 2024) ...............................................52

*Hooks v. Kitsap Tenant Support Servs., Inc.*, 816 F.3d 550, 556 (9th Cir. 2016)...45

*Hooks v. Kitsap Tenant Support Servs., Inc.*, 816 F.3d 550, 564 (9th Cir. 2016)...36

*In re Crocker*, 941 F.3d 206, 213 (5th Cir. 2019) ...................................................22

*Kajmowicz v. Whitaker*, 42 F.4th 138, 148 (3d Cir. 2022) .....................................52

*L.M.-M. v. Cuccinelli*, 442 F. Supp. 3d 1, 24 (D.D.C. 2020) .................... 16, 24, 39

*Medellín v. Texas*, 552 U.S. 491, 531 (2008) .........................................................35

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Manning*, 578 U.S. 374, 398 (2016) ..............................................................................................................................21

*N.L.R.B. v. SW Gen., Inc.*, 580 U.S. 288 (2017). ......................................................7

*N.L.R.B. v. SW General, Inc.*, 580 U.S. 288, 288 (2017) ................................. 10, 46

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) ..45

*United States v. Cooper*, 396 F.3d 308, 312 (3d Cir. 2005), ...................................29

*United States v. Garcia*, 2025 WL 2784640 (D. Nev. Sept. 30, 2025) .............. 8, 18

*United States v. Giraud*, 2025 WL 2416737 (D.N.J. Aug. 21, 2025) .....................8

*United States v. Miller*, 145 S. Ct. 839, 854 (2025) ................................................24

*United States v. O'Brien*, 560 U.S. 218, 232 (2010) ...............................................24

**Statutes**

S. Rep. 105-250, at 12 (1998) ...................................................................................27

151 Cong. Rec. S12822 (daily ed. Oct. 21, 1998) (Statement of Sen. Fred
 Thompson). ...........................................................................................................27

28 U.S.C. § 541 ..........................................................................................................50

5 U.S.C. § 3345 .............................................................................................. passim

5 U.S.C. § 3347 ..........................................................................................................51

Act of Feb. 13, 1795, ch. 21, 1 Stat. 415. ..................................................................9

Act of July 23, 1868, ch. 227, 15 Stat. 168................................................................10

Act of May 8, 1792, ch. 37, § 8, 1 Stat. 28 ...............................................................20

Act of May 8, 1792, ch. 37, § 8, 1 Stat. 281 .............................................................9

PATRIOT Act. Pub. L. No. 109-177, Title V, § 502, 120 Stat. 192, 246 (2006) ..12

Pub. L. No. 110-34, § 2, 121 ....................................................................................12

**Other Authorities**

130 Cong. Rec. S10996 (daily ed. Sept. 25, 1998)...................................................26

130 Cong. Rec. S10996 (daily ed. Sept. 25, 1998)...................................................22

132 Cong. Rec. S11027 (Statement of Sen. Carl Levin) (daily ed. Sept. 28, 1998).

..................................................................................................26

132 Cong. Rec. S11032  (daily ed. Sept. 28, 1998) (Statement of Sen. John Glenn).
..................................................................................................27

132 Cong. Rec. S11032 (daily ed. Sept. 28, 1998) (Statement of Sen. John Glenn)
..................................................................................................25

132 Cong. Rec. S11037 (Statement of Sen. Joe Liebermann) (daily ed. Sept. 28,
1998). ....................................................................................26

*Guidance on Application of Federal Vacancies Reform Act of 1998*, 23 Op. O.L.C.
60, 63-64 (1999)..................................................................36

Letter from Members of the U.S. Senate Comm. on Com., Sci., & Transp. to
President Joseph R. Biden, Jr. (Sept. 20, 2023)....................................44

Morton Rosenberg, Congressional Research Service Report for Congress, The
New Vacancies Act: Congress Acts to Protect the Senate's Confirmation
Prerogative 1 (1998). ............................................................10

Morton Rosenberg, Congressional Research Service, Validity of Designation of
Bill Lann Lee as Acting Assistant Attorney General for Civil Rights 1–3 (1998)
..................................................................................................11

Steven J. Duffield & James C. Ho, *The Illegal Appointment of Bill Lann Lee*, Note,
2 Tex. Rev. L. & Pol. 335, 348–53 (1999). ......................................11

The Federalist No. 76, p. 457 (C. Rossiter ed. 1961) (A. Hamilton)). .....................9

# INTRODUCTION

When a President inherits a vacancy at a U.S. Attorney's Office, he has a wide range of options for filling it. Under the Federal Vacancies Reform Act, the person serving as First Assistant U.S. Attorney at the time the vacancy arises automatically becomes Acting U.S. Attorney. But if the President wants to name a different person as Acting U.S. Attorney, he has a vast pool of individuals to choose from: He may select one of the thousands of senior-level employees at the DOJ or, alternatively, one of the hundreds of individuals serving in an office requiring Presidential appointment and Senate Confirmation (a "PAS Office"). Such an individual may serve as Acting U.S. Attorney for, at a minimum, the first 300 days of the President's term. And if the President is not content with any of those choices, he may—for a period of 120-days—direct the Attorney General to appoint anyone he desires as Interim U.S. Attorney.

But what the President cannot do is install whomever he wants for as long as he wants. In response to concerns that unchecked "acting" appointments were becoming "a threat to the Senate's advice and consent power," Congress in 1998 acted to close the perceived loopholes that the Executive Branch regularly exploited. *N.L.R.B. v. SW Gen., Inc.*, 580 U.S. 288, 295 (2017). Through the passage of the Federal Vacancies Reform Act ("FVRA"), 5 U.S.C. § 3345 *et seq.*, Congress set clear limitations on the scope of the President's authority.

Yet in attempting to install Alina Habba as Acting U.S. Attorney after her nomination stalled in the Senate, the Executive Branch has tried to deploy the precise maneuvering that the FVRA was enacted to prevent. After Ms. Habba's term as Interim U.S. Attorney for the District of New Jersey expired on July 1, 2025, the President pursued a shell game to keep her in power. Relying on a chimera of at least seven different statutes, the government has, at various times, described Ms. Habba as "Interim U.S. Attorney," "Acting U.S. Attorney," "First Assistant U.S. Attorney," and "Special Attorney." But she does not have the authority to lead the U.S. Attorney's Office for the District of New Jersey under any of those titles.

The only courts to confront the government's theories have had little difficulty rejecting them. *See United States v. Garcia*, 2025 WL 2784640 (D. Nev. Sept. 30, 2025); *United States v. Giraud*, 2025 WL 2416737 (D.N.J. Aug. 21, 2025). As those courts have recognized, each convoluted textual argument advanced by the government fails on its own terms. And if the text of the relevant statutes left any ambiguity as to whether Ms. Habba could continue in her role, looking to the context, structure, and history of those statutes would dispel all doubt. This Court should affirm the district court's ruling that Ms. Habba has no authority to continue leading the U.S. Attorney's Office for the District of New Jersey.

## STATEMENT OF THE CASE

### A. Statutory Background

Congress has never afforded the President unlimited power to install acting officers. Since the founding, Congress has preserved the Framers' vision that the confirmation process would serve as "an excellent check upon a spirit of favoritism in the President" and a guard against "the appointment of unfit characters . . . from family connection, from personal attachment, or from a view to popularity.'" The Federalist No. 76, p. 457 (C. Rossiter ed. 1961) (A. Hamilton)).

But while Congress has been careful not to dilute the vital role of the Senate's advice and consent power as a "structural safeguard[ ] of the constitutional scheme," *Edmond v. United States,* 520 U.S. 651, 659 (1997), it has also recognized that the crucible of Senate confirmation may be slow. To minimize the disruption posed by a vacancy, Congress has provided the President with statutory mechanisms to maintain continuity by appointing non-Senate-confirmed officials on a temporary basis.

The earliest vacancies statute, enacted during President Washington's first term, authorized the President to appoint "any person or persons" to fill specific vacancies in the Departments of State, Treasury, and War. Act of May 8, 1792, ch. 37, § 8, 1 Stat. 281. Congress initially permitted acting officers to serve until the vacancy was filled by a permanent officeholder, *ibid.*, but subsequently imposed a six-month limit on acting service, Act of Feb. 13, 1795, ch. 21, 1 Stat. 415.

Congress fully revisited the issue of acting appointments in the 1860s. *See SW Gen.*, 580 U.S. at 294. Through the Vacancies Act of 1868, Congress "expanded the number of PAS offices that the President could fill with acting officers," but "[w]ith that expansion came new constraints." *Id.* Critically, Congress stripped the President of his authority to appoint "any person or persons" and instead set a default rule that the "first or sole assistant . . . shall" perform the duties of a vacant office. Act of July 23, 1868, ch. 227, 15 Stat. 168. The President could override that statutory default rule only by temporarily installing an official already serving as a PAS officer. *Id.*

During the 1990s, interbranch conflict arose over the Executive Branch's attempts to flout the restrictions of the Vacancies Act. *SW Gen.*, 580 U.S. at 294. By 1998, approximately 20 percent of PAS offices in executive agencies were occupied by "temporary designees, most of whom had served beyond the 120–day limitation period . . . without presidential submissions of nominations." Morton Rosenberg, Congressional Research Service Report for Congress, The New Vacancies Act: Congress Acts to Protect the Senate's Confirmation Prerogative 1 (1998). "These acting officers filled high-level positions, sometimes in obvious contravention of the Senate's wishes." *SW Gen.*, 580 U.S. at 295.

Congress's breaking point occurred in 1998, when the Attorney General appointed someone from outside government to serve as Acting Assistant Attorney General for DOJ's Civil Rights Division immediately after the Senate refused to

confirm him for that very office. *Id.*; *see* Morton Rosenberg, Congressional Research Service, Validity of Designation of Bill Lann Lee as Acting Assistant Attorney General for Civil Rights 1–3 (1998); Steven J. Duffield & James C. Ho, *The Illegal Appointment of Bill Lann Lee*, Note, 2 Tex. Rev. L. & Pol. 335, 348–53 (1999). "Perceiving a threat to the Senate's advice and consent power," Congress responded by replacing the Vacancies Act with the FVRA. *SW Gen.*, 580 U.S. at 295.

The FVRA permits three categories of government officials to perform acting service in a vacant PAS office. Subsection 3345 (a)(1) prescribes a general rule: If a person serving in a PAS office dies, resigns, or is otherwise unable to perform their duties, the First Assistant to that office "shall perform" the office's "functions and duties . . . temporarily in an acting capacity." The next two paragraphs of section 3345(a) identify alternatives. Subsection (a)(2) provides that "notwithstanding paragraph (1)," the President "may direct a person" who already serves in a PAS office to "perform the functions and duties of the vacant office temporarily in an acting capacity." Subsection (a)(3) adds that the President also "may direct" a person to perform acting duties if the person served in a senior position in the relevant agency for at least 90 days in the 365-day period preceding the vacancy. In sum, the FVRA allows the President to fill a vacancy with 1) the First Assistant; 2) a different PAS officer; or 3) a high-level civil servant within the agency.

The FVRA is not the only statute allowing the Executive Branch to install a temporary U.S. Attorney without Senate confirmation. Under 28 U.S.C. § 546(a), a statute specific to U.S. Attorney's offices, the Attorney General "may appoint a United States Attorney for the district in which the office of United States Attorney is vacant," and the appointment is valid until "the expiration of 120 days after appointment by the Attorney General." *Id.* When the appointment expires after 120 days, "the district court for such district may appoint a United States attorney to serve until the vacancy is filled." *Id.* § 546(d). Congress removed the 120-day limit in 2006 as part of the PATRIOT Act. Pub. L. No. 109-177, Title V, § 502, 120 Stat. 192, 246 (2006). But just more than a year later, Congress amended the statute to revert back to the pre-PATRIOT Act limit of 120 days. Pub. L. No. 110-34, § 2, 121 Stat. 224 (2007). The catalyst for the reversion was Congress's concern about "several instances where the Attorney General made successive interim appointments pursuant to section 546 of either the same or different individuals." H.R. Rep. No. 110-58 at 6 (2007). The statute has not changed since the 2007 amendment.

## B. Factual Background

On January 8, 2025, the Senate-confirmed U.S. Attorney for the District of New Jersey, Philip Sellinger, resigned from office. Appx2. When Mr. Sellinger resigned, First Assistant U.S. Attorney Vikas Khanna automatically became the Acting U.S. Attorney under the FVRA. 5 U.S.C. § 3345(a)(1); Appx2–3. President Trump was inaugurated on January 20, 2025, and he elected to leave Mr. Khanna as the Acting U.S. Attorney for the first six weeks of his presidency. Appx3.

On March 3, 2025, Attorney General Bondi replaced Mr. Khanna by appointing John Giordano as the Interim U.S. Attorney for the District of New Jersey under 28 U.S.C. § 546(a). *Id.* A few weeks later, President Trump announced that he would be replacing Mr. Giordano with Alina Habba, who was then serving in the White House as Counselor to President. *Id.* Ms. Habba's appointment became effective on March 28, 2025. *Id.* Shortly after assuming the Interim U.S. Attorney role, Ms. Habba appointed Desiree Leigh Grace to the position of First Assistant U.S. Attorney.

Though Ms. Habba's interim appointment expired on July 1, 2025, *see* Appx99, she and the Attorney General mistakenly believed that it was valid until July 25, 2025. Appx34. Ms. Habba thus continued to present herself as the Interim U.S. Attorney until that date. Appx34–35. The U.S. District Court for the District of New Jersey, exercising its power under 28 U.S.C. § 546(d), announced on July 22,

2025 that it would be appointing Ms. Grace to succeed Ms. Habba as interim U.S. attorney. Appx99. The President fired Ms. Grace shortly thereafter. Appx100.

The President and Attorney General then deployed a series of novel maneuvers in an attempt to reinstall Ms. Habba as the head of the U.S. Attorney's office after her interim term expired. The steps most relevant to this appeal occurred on July 24, 2025. First, Ms. Habba announced that she would "resign" from her position as Interim U.S. Attorney, effective at 5:00 pm that day. Appx160. Her resignation letter stated, however, that she "look[ed] forward to continuing to lead the US Attorney's Office for the District of New Jersey." *Id.* Second, Attorney General Bondi appointed Ms. Habba to an indefinite term as a "Special Attorney" authorized to conduct "any kind of legal proceeding" in the District of New Jersey. Appx163–64. Third, the Attorney General signed an order stating that she had designated Ms. Habba as "a [f]irst [a]ssistant United States Attorney" for the District of New Jersey, effective upon her "resignation" as interim U.S. Attorney. Appx165. The order stated that Ms. Habba's designation as a "first assistant" U.S. Attorney would allow her to serve as Acting U.S. Attorney under the FVRA. *Id.*

## C. Procedural History

After the Attorney General purported to appoint Ms. Habba to lead the U.S. Attorney's Office under the titles of "Special Attorney" and "first assistant" U.S. Attorney, defendants in two cases supervised by Ms. Habba in the District of New

Jersey challenged the legality of her purported appointment. Chief Judge Chagares of the U.S. Court of Appeals for the Third Circuit reassigned cases challenging Ms. Habba's appointment to Chief Judge Brann of the Middle District of Pennsylvania. Appx8.

On August 21, 2025, Chief Judge Brann ruled that Ms. Habba's purported appointment was unlawful, and that Ms. Habba had been "exercis[ing] the functions and duties" of U.S. Attorney without legal authority since July 1, 2025. Appx28–29. The district court held that Ms. Habba was not authorized to lead the U.S. Attorney's Office under the FVRA, 28 U.S.C. § 546, or any other statute. The ruling "disqualif[ied] Ms. Habba from engaging in the prosecutions of [the defendants] and from supervising the same." Appx29. But the district court denied the defendants' motions to dismiss upon concluding that Ms. Habba's invalid signature on an indictment did not necessitate its dismissal. Appx103. The Court *sua sponte* stayed its decision pending the resolution of this appeal. Appx104.

## SUMMARY OF ARGUMENT

The district court correctly held that the Executive Branch cannot circumvent Congressionally-enacted limitations on temporary U.S. Attorney appointments through either (1) purporting to make Ms. Habba the Acting U.S. Attorney under the

FVRA, or (2) attempting to delegate to Ms. Habba "all of the powers" of a U.S. Attorney under a combination of other statutes.[1]

Ms. Habba is ineligible to serve as Acting U.S. Attorney under the FVRA for four reasons. First, Ms. Habba does not qualify as the relevant First Assistant within the meaning of the FVRA. The term "first assistant" in subsection 3345(a)(1) refers to the individual serving as First Assistant U.S. Attorney at the time the vacancy arises. That was Mr. Khanna, not Ms. Habba. Subsection 3345(a)(1), which "automatically" propels a First Assistant into acting service, is "mandatory and self-executing." *S.W. Gen.*, 580 U.S. at 303, 305. It is not a discretionary mechanism that the Executive Branch can manipulate by naming a new "first assistant" post-vacancy.

Second, regardless of that temporal constraint, Ms. Habba is *still* not a First Assistant under subsection 3345(a). That is because she "never did and never will serve in a subordinate role." *L.M.-M. v. Cuccinelli*, 442 F. Supp. 3d 1, 24 (D.D.C. 2020). As the government acknowledges, "the first assistant is the individual who is hierarchically second in command." Gov't Br. 23. But the government has reiterated that "Ms. Habba is the person the President wishes to *head* the Office of the United

---

[1] The District Court also held that the Attorney General's power to appoint an interim U.S. Attorney under 28 U.S.C. § 546 is time-limited to a cumulative total of 120 days. The Attorney General cannot, for example, make multiple 119-day appointments. The government has declined to appeal this ruling.

States Attorney for the District of New Jersey." Appx80 (emphasis added). The President has never indicated that he intends for Ms. Habba to serve as a deputy.

Third, subsection 3345(b)(1)(A) categorically bars Ms. Habba from serving as Acting U.S. Attorney because the President submitted her nomination for that position to the Senate. "Once the President submitted [her] nomination," Ms. Habba became ineligible to serve as acting officer. *S.W. Gen.*, 580 U.S. at 309. Supreme Court precedent squarely forecloses the government's argument that withdrawing a nomination can restore a past nominee's eligibility. *Id.*

And fourth, when an interim U.S. Attorney appointment under 28 U.S.C. § 546(a) expires after 120 days, the sole mechanism for filling that vacancy is provided by subsection 546(d). The FVRA does not kick in for a *second* time when a Section 546 interim appointment ends; Section 3345 is triggered only by the departure of an "officer . . . whose appointment to office is required to be made by the President, by and with the advice of the Senate." 5 U.S.C. § 3345(a). That does not describe an interim appointee. Neither Section 546 nor the FVRA provides the exclusive means for appointing a person to temporarily lead a U.S. Attorney's office, and "the President is permitted to elect between these two statutory alternatives." *Hooks v. Kitsap Tenant Support Servs., Inc.*, 816 F.3d 550, 556 (9th Cir. 2016). The President may rely on the FVRA to appoint an eligible acting officer for the 300 days after his Inauguration, and he may supersede or follow that appointment with a 120-day

interim appointment under section 546. But once the President (through the Attorney General) chooses to displace the FVRA by invoking 28 U.S.C. § 546, the more specific statute, that statute continues to control for the remainder of the vacancy. Subsection 3345(a)(1) does not reemerge to displace 28 U.S.C. § 546(d) after 120 days, as the end of an interim term is not the type of "vacancy" described in Section 3345. *See United States v. Garcia*, 2025 WL 2784640, at \*6 n.6 (D. Nev. Sept. 30, 2025).

Nor may the Attorney General anoint Ms. Habba head of the U.S. Attorney's Office by delegating to her "all of the powers" of a U.S. Attorney. Appx96. Under the government's theory of delegation, the carefully crafted statutory schemes of the FVRA, 28 U.S.C. § 546, and 28 U.S.C. § 541 are little more than surplusage. There is no reason for the Executive Branch to use any of these statutes if—as it claims here—it can rely on delegation to "indefinite[ly]" install an individual like Ms. Habba as the functional equivalent of a U.S. Attorney. Appx163. The government's delegation argument is also entirely inconsistent with the statutory text. The FVRA's exclusivity provision, 5 U.S.C. § 3347, expressly bars the Attorney General from using general vesting and delegation statutes to give Ms. Habba the full powers of United States Attorney for the District of New Jersey. Section 3347(a) establishes that, absent exceptions not relevant here, "Sections 3345 and 3346 are the *exclusive* means for temporarily authorizing an acting official to perform the functions and

duties of any office of an Executive agency . . ." (emphasis added). Further, the history surrounding the FVRA's enactment conclusively refutes the government's theory of delegation. It is universally understood that the FVRA was passed to close the delegation loophole that the Attorney General now believes she has found. There is a reason that this is a case of first impression: There has never been such a brazen attempt to defy Congress by using general delegation statutes to install an unconfirmed U.S. Attorney.

## STANDARD OF REVIEW

This Court reviews questions of statutory interpretation *de novo*. *See United States v. Hodge*, 948 F.3d 160, 162 (3d Cir. 2020).

## ARGUMENT

### I. The FVRA DOES NOT ALLOW MS. HABBA TO SERVE AS ACTING U.S. ATTORNEY.

#### A. The Only "First Assistant" Eligible To Serve As Acting U.S. Attorney Under The FVRA Is The First Assistant At The Time The Vacancy Occurs.

The district court correctly concluded that under the FVRA, "first assistant" refers to the First Assistant U.S. Attorney at the time a vacancy arises. Appx74. This Court should affirm that commonsense interpretation and reject the government's unsupported assertion that "first assistant" refers to anyone the Attorney General chooses to bestow that title upon during the pendency of a vacancy. In the government's view, subsection 3345(a)(1) gives the Attorney General the power to

19

handpick the Acting U.S. Attorney whenever there is no Senate-confirmed U.S. Attorney. That interpretation contradicts the text and structure of the FVRA, as well as the history that led to its enactment. The FVRA envisions no role for the Attorney General in selecting acting officers.

Start with the text. As the Supreme Court explained in *Southwest General*, 580 U.S. at 294, the earliest vacancies statute—enacted in 1792—gave the President the authority to fill a limited number of vacancies in the Departments of State, Treasury, and War with "any person or persons." Act of May 8, 1792, ch. 37, § 8, 1 Stat. 281. In 1868, Congress overhauled that system and expanded the number of PAS offices that the President could fill. *See* Act of July 23, 1868, ch. 227, 15 Stat. 168. But "with that expansion came new constraints" on *who* the president could install as acting officer. *S.W. General*, 580 U.S. at 294. Critically, "the authority to appoint 'any person or persons' as an acting officer gave way to a default rule that the 'first or sole assistant . . . shall' perform that function." *Id.* (quoting 15 Stat. 168). If the president sought to override this default rule, the Act permitted him to fill the vacancy only with someone who had already been confirmed to a different PAS office. *Id.*

Though the Vacancies Act has been amended twice since 1868, Congress has made only modest changes to the provision establishing that the First Assistant "shall" serve as acting officer. The Vacancies Act of 1868 stated that when the head

of any executive department becomes unable to perform his role, "the first or sole assistant thereof shall . . . perform the duties of such head . . . ." 15 Stat. 168. The current statute, the FVRA, similarly states that when a PAS officer becomes unable to perform his role, "the first assistant to the office of such officer shall perform" the office's functions and duties. 5 U.S.C. § 3345(a)(1). Congress has never reverted to the language of the 1792 statute allowing the President to appoint "any person or persons." 1 Stat. 281.

Under the government's interpretation of the FVRA, however, the phrase "first assistant to the office of such officer" functionally means the same thing as "any person or persons," the phrase that Congress replaced in 1868. Unlike the Supreme Court, the government believes that the elimination of the phrase "any person or persons" did not actually impose a "constraint[]." *S.W. Gen.*, 580 U.S. at 294. In the government's view, the President (through the Attorney General) can still appoint "any person or persons" as acting officers, so long as the Attorney General describes them as the "first assistant" post-vacancy.

But that interpretation contravenes a fundamental principle of statutory construction. "Ordinarily, the deliberate selection of language differing from the language of previous acts indicates an intended change of the law." *Girard Inv. Co. v. Comm'r of Internal Revenue*, 122 F.2d 843, 846 (3d Cir. 1941); *see Merrill Lynch, Pierce, Fenner & Smith Inc. v. Manning*, 578 U.S. 374, 398 (2016) (Thomas

J., concurring) ("[W]hen Congress enacts a statute that uses different language from a prior statute, we normally presume that Congress did so to convey a different meaning.") (citations omitted). That presumption is especially strong "[w]hen Congress makes a *significant* change in language." *See In re Crocker*, 941 F.3d 206, 213 (5th Cir. 2019) (citing Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 256 (2012) (emphasis added)). The government does not attempt to rebut this presumption; it simply ignores that Congress made this significant change in 1868.

Though the government disregards the seismic shift from "any person or persons" to "first assistant," it overreads a non-substantive textual change intended only to clarify the meaning of "first assistant." In amending the Vacancies Act through the passage of the FVRA, Congress specified that the individual who automatically assumes the acting officer role when a PAS officer departs is the "first assistant *to the office* of such officer." 5 U.S.C. § 3345(a)(1) (emphasis added). In its prior form, the statute stated—rather ambiguously—that the "first assistant *to the officer*" would perform acting service. *See* 130 Cong. Rec. S10996 (daily ed. Sept. 25, 1998).

The government concedes that under the pre-FVRA formulation, only a single person could assume acting service under the "self-executing" rule of subsection 3345(a)(1): the First Assistant at the time of the vacancy. But the government asserts

that by replacing "to the officer" with "to the office of such officer," the FVRA established that any person named "first assistant" *post-vacancy* would also assume an acting officer role. In contending that there are no eligibility restrictions on who the Attorney General may tap as "first assistant," the government asserts that the FVRA's addition of the words "to the office" portended a radical change. In the government's view, Congress's decision to replace "first assistant to the officer" with "first assistant to the office of such officer" was an undertaking to afford the Attorney General near-unlimited discretion to choose anyone she wants as the acting officer.

The government's reading of this modest change of phrase proves far too much. If "Congress intended such a sea change" in the acting appointments process, "it would have said so clearly." *Bd. of Trs. of Leland Stanford Junior Univ. v. Roche Molecular Sys., Inc.*, 563 U.S. 776, 792 (2011) (Roberts, C.J.). "Fundamental changes in the scope of a statute are not typically accomplished with so subtle a move." *Kellogg Brown & Root Servs., Inc. v. U.S., ex rel. Carter*, 575 U.S. 650, 661 (2015). As the Supreme Court has repeatedly instructed, Congress does not "hide elephants in mouseholes." *Whitman v. American Trucking Assns., Inc.*, 531 U.S. 457, 468 (2001).

The better interpretation of Congress's minor textual modification is the intuitive one. Rather than dramatically reshaping the scope of the Executive Branch's authority, the tweak to subsection 3345(a)(1) merely clarified that "first

23

assistant" is a term of art referring to the principal deputy at a PAS *office*. Properly understood, the FVRA's change in language was intended only to "clarify" the law, "not alter the substantive elements." *United States v. Miller*, 145 S. Ct. 839, 854 (2025); *see United States v. O'Brien*, 560 U.S. 218, 232 (2010) ("[T]here is nothing to suggest that the . . . amendments were intended to change, rather than simply reorganize and clarify." (internal quotations omitted)).

By changing "first assistant to the officer" to "first assistant to the office," Congress alleviated two potential sources of confusion. First, as the D.C. District Court explained in *Cuccinelli*, 442 F. Supp. 3d 1 (D.D.C. 2020), the phrase "first assistant to the office" makes plain that the person who shall serve as Acting U.S. Attorney is not the personal aide to the U.S. Attorney:

> To borrow from a long-running riff on the television show *The Office*, there may well be a difference between one who serves as "the assistant regional manager" and "the assistant to the regional manager."

*Cuccinelli*, 442 F. Supp. 3d 1, 26 n.8; *see* Appx67 (explaining that the change to "first assistant to the *office*" can be read to demonstrate that "first assistant" is "a term of art which refers to the agency's formal hierarchical structure" rather than "the person on which the outgoing officer relied most heavily.").

Second, the change clarified that "first assistant" refers to a specific position within a department or agency, not simply the next in the line of succession at any given moment. That is why the First Assistant position may be vacant in certain

instances.[2] At the FBI, for example, the Deputy Director is the First Assistant.[3] If that person were to resign, there would be no First Assistant until the FBI Director named someone else to fill the role of Deputy Director. The next person in the chain of command would not automatically become First Assistant within the meaning of the FVRA.

Although this court need not resort to legislative history given that the government's textual arguments fail on their own terms, the Congressional record surrounding the FVRA's enactment flatly refutes the government's preferred interpretation of "first assistant to the office." While the Congressional record provides no indication that Congress sought to allow a post-vacancy "first assistant" to serve as acting officer, abundant evidence confirms that Congress intended for the phrase "to the office of such officer" to clarify—not alter—the meaning of "first assistant."

---

[2] *See* 132 Cong. Rec. S11032 (daily ed. Sept. 28, 1998) (Statement of Sen. John Glenn) (explaining that he would introduce a provision to allow civil servants to serve as acting officers to give the President "a larger pool from which to choose an acting official," especially "where there is no first assistant").

[3] *See generally* Sarah N. Lynch, *FBI Acting Director Paul Abbate retires from the bureau, official says*, Reuters (Jan. 20, 2025) https://www.reuters.com/world/us/fbi-acting-director-paul-abbate-retires-bureau-official-says-2025-01-20/ (stating that Paul Abbate, the Deputy Director of the FBI, became acting FBI Director after the Director resigned); 28 C.F.R. § 0.137(b) ("Where there is a position of Principal Deputy to the PAS office, the Principal Deputy shall be the First Assistant.").

Both proponents and opponents of the FVRA believed that the phrase "first assistant to the *office*" exclusively referred to the First Assistant at the time the vacancy arose. On September 25, 1998, Senator Thompson introduced the amendment that modified "first assistant to the officer" to "first assistant to the office." 130 Cong. Rec. S10996 (daily ed. Sept. 25, 1998) Three days later, Senator Liebermann gave a floor speech explaining that he was voting against cloture on Senator Thompson's bill because "by the terms of the bill, a first assistant apparently can take over only if she was the first assistant at the time of the vacancy." 132 Cong. Rec. S11037 (Statement of Sen. Joe Liebermann) (daily ed. Sept. 28, 1998). This was, in Senator Liebermann's view, an unduly "severe limitation." *Id.*

Senator Liebermann was not alone in opposing the bill for that reason. That same day, Senator Levin explained that he too was voting against cloture because limiting "who can be acting officer" to "a first assistant or another advice and consent nominee" was "too restrictive a pool." 132 Cong. Rec. S11027 (Statement of Sen. Carl Levin) (daily ed. Sept. 28, 1998). As he explained, "first assistants may not exist for all vacant positions." *Id.* Also on the same day, Senator Glenn stated that he "intend[ed] to offer an amendment to add a third category of qualified individuals" to fill vacancies that would include "high-level members of the civil service" in order to "give the President a larger pool from which to choose an acting official, particularly in a case where there is no first assistant." 132 Cong. Rec. S11032 (daily

ed. Sept. 28, 1998) (Statement of Sen. John Glenn). That amendment resulted in the provision that was ultimately codified as subsection 3345(a)(3).[4]

Senator Thompson subsequently confirmed that those Senators opposing his bill were correct to interpret "first assistant to the office" as referring to only the First Assistant at the time of the vacancy. He explained that "first assistant to the office" afforded the president no more discretion than "first assistant to the officer":

> This change is made to "depersonalize" the first assistant. . . . "[F]irst assistant to the officer" has been part of the Vacancies Act since 1868 . . . and the change in wording is not intended to alter case law on the meaning of the term 'first assistant.'

151 Cong. Rec. S12822 (daily ed. Oct. 21, 1998) (Statement of Sen. Fred Thompson).

There are several additional problems with the government's position that a post-vacancy "first assistant" may assume the role of acting officer. Under the government's reading of "first assistant," the official that has the ultimate discretion to select an acting U.S. Attorney is the Attorney General. The government argues that the Attorney General is the individual with the power to name a "first assistant," so she can install nearly whomever she wants as Acting U.S. Attorney.

---

[4] The Congressional Record also indicates that the default first-assistant rule exists "because such person is often a career official with knowledge of the office." S. Rep. 105-250, at 12 (1998). Not so for a post-vacancy "first assistant" from outside the agency like Ms. Habba.

But the text of Section 3345 emphasizes that the power to name an acting officer belongs to *exclusively* the President. In three separate places, the statute makes clear that "the President (and only the President)" has the authority to choose who serves as acting officer. *See* 5 U.S.C. § 3345(a)(2) ("the President (and only the President) may direct [a Senate-confirmed official] to perform the functions and duties of the vacant office temporarily in an acting capacity"); *id.* § 3345(a)(3) ("the President (and only the President) may direct an officer or employee of such Executive agency [to lead] . . . temporarily in an acting capacity"); *id.* § 3345(b)(c)(1) ("the President (and only the President) may direct an officer who is nominated by the President for reappointment for an additional term . . . to continue to serve in that office . . ."). This is not a statute that envisions a role for anyone else, and it certainly cannot be read to afford the greatest degree of discretion to the Attorney General. [5]

---

[5] The government's interpretation of 5 U.S.C. § 3345(a) has yet another confounding implication. Under the government's reading of subsection (a)(1), the Attorney General would face only two restrictions in naming a post-vacancy "first assistant" to serve as acting officer. The Attorney General could not select as "first assistant" either PAS officers, *see* subsection (a)(2), or experienced civil servants who served at the DOJ for 90 days in the year preceding the vacancy, *see* (a)(3). That is because the power to install those individuals as acting officers belongs to the "President (and President alone)." 5 U.S.C. § 3345(a)(2)-(3). The government's reading of (a)(1) thus provides that the Attorney General can use the "first assistant" provision to name *nearly* anyone she wants as acting officer, but because of subsection (a)(3), she cannot not select an experienced prosecutor who served at the DOJ for more than 90 days in the past year. So, some of the most qualified individuals are among the only ones she cannot choose to lead the office.

28

Apart from the text and legislative history, looking to the context and structure of the FVRA's different provisions confirms that "first assistant" under subsection 3345(a)(1) cannot refer to a person named first assistant post-vacancy. For the overwhelming majority of PAS officer vacancies, the government's preferred reading of subsection 3345(a)(1) would render superfluous subsections (a)(2) and (b)(3). Such a reading defies the bedrock principle of statutory construction that "courts should construe statutory language to avoid interpretations that would render any phrase superfluous." *United States v. Cooper*, 396 F.3d 308, 312 (3d Cir. 2005), *as amended* (Feb. 15, 2005) (citing *TRW Inc. v. Andrews*, 534 U.S. 19, 29 (2001)).

Subsections (a)(2) and (a)(3) of the FVRA afford the President two options for a non-first-assistant acting official: either a person who has already been confirmed by the Senate to another officer position, or a civil servant who worked in the relevant agency for at least 90 days before the vacancy and was paid at the GS-15 level. Congress acted intentionally in crafting these two options. It viewed latter as an expansion of the President's power, negotiated over the course of a long deliberative process, in response to "concerns" about "vacancies in first assistant positions" at the start new Administrations. 151 Cong. Rec. S12822 (daily ed. Oct. 21, 1998) (Statement of Sen. Fred Thompson). But under the government's interpretation of "first assistant," these defined limitations are essentially meaningless, and adding the civil-servant option through the text of the FVRA was

29

unnecessary. That is because the President's choice of acting officer, according to the government, is not actually limited to the two categories of PAS officers and senior civil servants. Instead, he is free to direct the Attorney General to select as acting officer someone from outside the government—with no experience in the relevant agency—by naming her the first assistant at any time after a vacancy arises.

The government protests that subsections (a)(2) and (a)(3) are not *entirely* superfluous under its preferred reading because when the First Assistant position is itself a PAS office, the President cannot rely on subsection (a)(1) to appoint whomever he wants as First Assistant. See Gov't Br. at 22. But of the approximately 1,000 PAS offices in the federal government, *see id.* at 1, it appears that only cabinet-level offices (historically, between 20-25 offices) have First Assistants who are also PAS officers. That would account for approximately 2 to 2.5 percent of PAS offices. This Court should not adopt an interpretation of "first assistant" that, in addition to its other fatal deficiencies, would render subsections (a)(2) and (a)(3) superfluous in nearly 98 percent of vacancies.[6]

---

[6] The government contends that subsections (a)(2) and (a)(3) also play a distinct role when the President believes the individual serving as first assistant at the time of the vacancy is "best suited to perform the important second-in-command functions" to a temporary leader of the office. Gov't Br. at 22. The government argues that by naming an acting officer under subsections (a)(2) or (a)(3) rather than subsection (a)(1), the President is able to allow the first assistant at the time of the vacancy to continue serving as the office's second-in-command. *See id.* But under the government's interpretation of subsection (a)(1), subsections (a)(2) and (a)(3) are not necessary to accomplish that goal. A person does not need to continue to hold

The government advances two structural arguments in maintaining that section 3345(a) allows a post-vacancy "first assistant" to serve as acting officer, but neither line of reasoning is cogent. First, the government points out that elsewhere in section 3345, Congress included "backward-looking language" that makes eligibility for acting service for certain individuals "depend on the state of affairs during the time preceding the vacancy." Gov't Br. at 19. For instance, subsection 3345(a)(3)(A) provides that the President cannot select a civil servant as acting officer unless that person worked at the agency for 90 days in the year preceding the vacancy. *See id.* Because section 3345(a)(1) does not include such backward-looking language, the government argues "first assistant" cannot be read to mean only the First Assistant serving at the time of the vacancy. *See id.* at 19-20.

The district court rightly disposed of this argument. *See* Appx68 n.175.[7] There is a clear reason why subsection 3345(a)(1) lacks the backward-looking limitation that subsection (a)(3) imposes: "[t]he former is mandatory and self-executing: The first assistant '*shall* perform' acting duties. The latter, by contrast, speaks to who

_____

the formal title of "first assistant" to serve as second-in-command to any office or temporary officer. If subsections (a)(2) and (a)(3) did not exist, the President could still, according to the government's theory of subsection (a)(1), name a new "first assistant" to serve as acting officer, while subsequently directing the First Assistant at the time of the vacancy to serve as the new acting officer's second-in-command. Even in this unusual hypothetical, subsections (a)(2) and (a)(3) are superfluous under the government's reading of subsection (a)(1).

[7] The only other court to consider this argument rejected it for the same reasons. *United States v. Garcia*, 2025 WL 2784640, at *6 (D. Nev. Sept. 30, 2025).

'may not' be an acting officer." *SW General, Inc.*, 580 U.S. at 303 (quoting 5 U.S.C. § 3345). Because subsection (a)(1) is triggered at the moment the vacancy arises, imposing a 90-day eligibility restriction would threaten to create a temporary leadership vacuum in certain unforeseeable instances. For example, if the Senate-confirmed U.S. Attorney died two-and-a-half months after naming a new first assistant, a 90-day limitation in subsection (a)(1) would preclude anyone from automatically assuming the Acting U.S. Attorney role. Such a constraint would prevent the "self-executing" mechanism from operating. Because subsection (a)(3) limits who the President may *affirmatively* pick as Acting head, there is no similar concern that imposing a backward-looking 90-day limitation would ever result in a leadership void.

The government's other structural argument has been rejected expressly by the Supreme Court. Subsection 3345(b)(1) of the FVRA provides that a person cannot serve as acting officer if her nomination was submitted to the Senate and, during the year preceding the vacancy, she either "did not serve in the position of first assistant," *id*. § 3345 (b)(1)(A)(i), or served for fewer than 90 days, § 3345 (b)(1)(A)(ii). According to the government, the former limitation thus "expressly contemplates that a first assistant *may* serve as an acting official even if she 'did not serve in the position of first assistant' prior to the vacancy, so long as she is not also the nominee." Gov't Br. at 20 (quoting § 3345 (b)(1)(A)(i) (emphasis in original)).

That is the wrong reading of subsection 3345 (b)(1)(A)(i). The language addressing an acting officer who "did not serve in the position of first assistant" during the year preceding a vacancy refers to an acting officer that the President selected through either subsection 3345(a)(2) or (a)(3)—*i.e.*, a PAS officer from a different department or a GS-15 level civil servant—*not* a post-vacancy first assistant who assumed the acting officer role under (a)(1). Subsection (b)(1) does not indicate that a post-vacancy first assistant may be the acting officer; it merely recognizes that someone *other than* the first assistant may be the acting officer. *See SW Gen., Inc.*, 580 U.S. at 299 ("[T]he prohibition in subsection (b)(1) applies to anyone performing acting service under the FVRA. It is not, as the [government] contends, limited to first assistants performing acting service under subsection (a)(1).").

Setting aside the infirmities with the government's textual and structural arguments about the meaning of "first assistant," allowing the Attorney General to handpick the Acting U.S. Attorney under subsection 3345(a)(1) would yield several strange consequences. To start, the government's interpretation of the Attorney General's power under subsection 3345(a) creates a perplexing relationship between the FVRA and section 546, the only statute that explicitly addresses the Attorney General's power to name a temporary U.S. Attorney. *See* 28 U.S.C. § 546. Section 546 expressly constrains the Attorney General in two ways: (1) she cannot name as

interim U.S. Attorney anyone whose nomination the Senate has "refused to give advice and consent," *id.* at § 546(b), and (2) she cannot name an interim U.S. Attorney for more than 120 days, *see id.* at § 546(c)(2). But the government's reading of the FVRA would allow the Attorney General to skirt both limitations. Under the government's view, an individual whose nomination the Senate has "refused to give advice and consent" by a vote of 100–0 can still be appointed by the Attorney General to lead the office under the "first assistant" mechanism of the FVRA. And the Attorney General could install that person for 210 days, not just 120. Though section 546 was enacted after the FVRA, it provides no indication that the latter gives the Attorney General an alternative source of authority. The FVRA cannot be read to *sub silentio* loosen the express textual limitations provided by section 546.

The Executive Branch's conduct in addressing this very vacancy further undermines the government's position that anyone named "first assistant" post-vacancy automatically assumes an acting officer role. After Ms. Habba was appointed Interim U.S. Attorney, she named Ms. Grace to the first assistant position. But according to the government's view that a person named as "first assistant" at any time during the pendency of a vacancy automatically becomes Acting U.S. Attorney, this move made Ms. Grace the Acting U.S. Attorney at the same time Ms. Habba was serving as Interim U.S. Attorney. Under the government's reading of section 3345(a)(1), a person becomes acting officer if she is named "first assistant"

34

at any time when an officer whose appointment was "made by the President with the advice and consent of the Senate" is "unable to perform" the role. But those conditions existed when Ms. Grace was appointed First Assistant U.S. Attorney: Ms. Habba was not an officer whose appointment was "made by the President with the advice and consent of the Senate," and the position was still unfilled by such an officer. Under the government's theory of phrase "first assistant to the office," Ms. Habba and Ms. Grace were leading the office simultaneously under two different statutes.

Because the government's textual and structural arguments fall short, it attempts to rely on past practice to justify its unbounded reading of the phrase "first assistant." The government argues that "longstanding Executive Practice" supports its interpretation that subsection 3345(a)(1) allows the Attorney General to pick post-vacancy first assistants to assume acting officer roles. It asserts that "Administrations of both parties have routinely" filled vacant offices "by appointing new first assistants at or after noon on Inauguration Day," and that those individuals automatically became acting officers under subsection 3345(a)(1). Gov't Br. at 20.

Though a "systematic, unbroken, executive practice, long pursued to the knowledge of Congress and never before questioned" may be evidence of a statute's meaning, *Medellín v. Texas*, 552 U.S. 491, 531 (2008) (quoting *Dames & Moore v. Regan*, 453 U.S. 654, 686 (1981)), the government offers no such evidence. Outside

of the current administration, the government musters only two examples of this supposed "longstanding practice." Gov't Br. at 20. And it has not pointed to a single instance where a person was installed as an Acting *U.S. Attorney* by being named "first assistant" post vacancy. The Supreme Court has explained that because "[t]he FVRA was not enacted until 1998," evidence of past practice "is not significant enough" to demonstrate that Congress has acquiesced to the Executive Branch's interpretation of the statute. *SW Gen., Inc.*, 580 U.S. at 308. As the district court observed, "[t]hat is all the truer here, where the Executive has only produced anecdotal evidence of post-vacancy-appointed first assistants," whereas the government in *Southwest General* provided 112 examples of the post-FVRA practice it (unsuccessfully) sought to preserve. Appx73.[8]

---

[8] In attempting to locate authority for its preferred interpretation of subsection 3345(a)(1), the government points to a letter from GAO and an opinion from OLC. *See* Gov't Br. at 20-21. But there are multiple reasons why those materials have no bearing on this Court's analysis of subsection 3345(a)(1). To begin, courts "rarely" give deference to an agency interpretation that conflicts with the agency's own prior opinion. *Kisor v. Wilkie*, 588 U.S. 558, 579 (2019). Here, OLC has analyzed section 3345(a)(1) "differently at different times." *Cuccinelli*, 442 F. Supp. 3d at 24; *contrast Guidance on Application of Federal Vacancies Reform Act of 1998*, 23 Op. O.L.C. 60, 63-64 (1999) ("[W]e believe . . . you must be the first assistant when the vacancy occurs in order to be the acting officer by virtue of being the first assistant"), *with Designation of Acting Associate Attorney General*, 25 Op. O.L.C. 177, 179-80 (2001) (concluding the opposite). Further, courts have never afforded weight to GAO or OLC's interpretations in the context of the FVRA. *See, e.g.*, *Hooks v. Kitsap Tenant Support Servs., Inc.*, 816 F.3d 550, 564 (9th Cir. 2016) ("Neither [GAO or OLC] is charged with administering the FVRA . . . and we give no deference to interpretations of statutes by agencies not charged with administering them."). And if GAO or OLC had previously been afforded deference, the Supreme Court in *Loper*

Lastly, the government argues that because "[i]t is important that a DOJ component is supervised by someone who has the support of the Executive Branch," Gov't Br. at 4, subsection (a)(1) must be read to allow the President to install a post-vacancy "first assistant" as acting U.S. Attorney. According to the government, it would "hamstring incoming presidential administrations" if the Executive Branch could not name whomever it wants as acting U.S. Attorney through the "first assistant" mechanism. *See id.* at 14. But the government fully undercuts its own argument by conceding that "[w]hen the first assistant position is itself a PAS office, (a)(1) is unavailable because the Executive Branch cannot appoint a first assistant without Senate confirmation." *Id.* at 22. The government thus recognizes that the President *cannot* select whomever he wants to serve as acting officer for the most important positions in the federal government: Secretary of State, Attorney General, Secretary of the Treasury, Secretary of Defense, and all other cabinet-level offices with a First Assistant position that is itself a PAS office. Given that the President cannot choose someone from outside of government to serve as Acting Attorney General, there is no reason why the same constraint would impermissibly "hamstring" him in the context of U.S. Attorney's offices.

---

*Bright Enterprises v. Raimondo* clarified that statutory interpretation is "the province and duty of the judicial department," so courts must "apply their judgment independent of the political branches." 603 U.S. 369, 412 (2024) (internal citations and quotation marks omitted).

Further, the President *does* have the power to pick "someone who has the support of the Executive Branch" as the temporary U.S. Attorney. Gov't Br. at 4. As the Supreme Court recognized in *Southwest General*, the president has "a wide array of individuals to choose from." 580 U.S. at 309. First, he may elect leave in place the first assistant U.S. Attorney at the time of the vacancy. That is what he chose to do at the U.S. Attorney's Office for the District of New Jersey for the first six weeks of his presidency. Second, under subsection (a)(2), the President may appoint any PAS officer in the federal government as Acting U.S. Attorney. In selecting such a person, the President has more than 1,000 offices to choose from. *See* Gov't Br. at 1. And third, under subsection (a)(3), the President may select any GS-15 level civil servant within the DOJ who has served for more than 90 days in the year preceding the vacancy as Acting U.S. Attorney. Those criteria afford the President the option of choosing among thousands of senior civil servants across the entire DOJ. Fourth and finally, if the President is not satisfied with any of these three options under the FVRA, he may turn to section 546 to, through the Attorney General, select essentially whomever he wants to serve as Interim U.S. Attorney for 120 days. This broad menu of options does not "hamstring" the President.

## B. An Employee Who Will Never Have a Supervisor is Not a "First Assistant"

Even if subsection 3345(a)(1) applied to individuals appointed to the position of "first assistant" at any time after the vacancy arose, Ms. Habba was never "first

assistant" within the meaning of subsection 3345(a)(1) because she "never did and never will serve in a subordinate role." *Cuccinelli*, 442 F. Supp. 3d at 24. As the U.S. District Court for the District of Columbia explained:

> [T]he word "assistant," . . . under any plausible construction comprehends a role that is, in some manner and at some time, subordinate to the principal.

*Id.* at 25-26.

Here, the government has expressly stated that "[T]he Executive Branch has made very clear whom they wish to be *in charge* of [the] office. That is Alina Habba . . . That is a choice, and the Executive Branch has made that very clear." Appx368. And Ms. Habba's purported delegation to lead the office is "indefinite." Appx161. Thus, "by design, [she] never has served and never will serve 'in a subordinate capacity' to any other official at [the office]." *Cuccinelli*, 442 F. Supp. 3d at 26. Though the Attorney General may have named Ms. Habba as "first assistant," "labels—without any substance—cannot satisfy the FVRA's default rule under any plausible reading of the statute." *Id.*

## C. The FVRA Prohibits a Former Nominee From Serving As First Assistant.

Even if Ms. Habba were the "first assistant" within the meaning of subsection 3345(a)(1), which she is not, another provision of the FVRA—subsection 3345(b)(1) —expressly bars her from serving as Acting U.S. Attorney. As the Supreme Court has explained, "[o]nce the President *submitted* [her] nomination to fill that position

in a permanent capacity," subsection (b)(1) prohibited her from serving as acting officer under subsection (a)(1). *SW General*, 580 U.S. at 309 (emphasis added).

The government argues that the relevant question under subsection 3345(b)(1) is whether a nomination is *pending*. According to the government, subsection 3345(b)(1) "does not prohibit service by individuals who do not have a nomination currently pending." Gov't Br. at 14. But the Supreme Court evaluated that very set of circumstances in *Southwest General* and concluded, in no uncertain terms, that the past nominee was ineligible to serve as acting officer. The acting officer at issue in *Southwest General* was Lafe Solomon, whose nomination to serve as general counsel of the NLRB was submitted to the Senate but—like Ms. Habba's— ultimately withdrawn. *SW Gen.*, 580 U.S. at 297. Mr. Solomon purported to serve as acting general before he was nominated, while his nomination was pending, and after it was withdrawn. *Id.*

The respondent in *Southwest General* argued that Mr. Solomon's past nomination rendered him ineligible to serve as acting general counsel, even though his nomination "was no longer pending" at the time of the NLRB action that respondent sought to challenge. *SW Gen., Inc. v. N.L.R.B.*, 796 F.3d 67, 72 n.3 (D.C. Cir. 2015).[9] The Supreme Court agreed with the respondent's reading of the FVRA.

---

[9] Specifically, the respondent challenged a NLRB complaint that was filed at a time when the Senate had returned Solomon's nomination and the President had not resubmitted it.

It held that "[o]nce the President submitted [Mr. Solomon's] nomination to fill that position in a permanent capacity, subsection (b)(1) prohibited him from continuing his acting service." *SW Gen.*, 580 U.S. at 309.

Notably, in *Southwest General*, the NLRB did not even argue "that the non-pendency of Solomon's nomination should make a difference." 796 F.3d at 72 n.3. The D.C. Circuit "assume[d]" that it did not, *id.*, and the Supreme Court did not disturb that assumption. The government might argue that because *Southwest General* did not specifically analyze the potential significance of the non-pendency of Solomon's nomination, the opinion does not fully foreclose the government's new theory that Subsection (b)(1) bars only pending nominees. But if the Supreme Court had any inkling that the non-pendency of Mr. Solomon's nomination rendered him eligible to serve as acting officer, the Court would have been obliged to *sua sponte* consider whether the respondent, which challenged only an action that occurred while Solomon's nomination was *not* pending, had standing to sue. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009).

Further, the fact that the NLRB did not make a "non-pendency" argument could not have had any impact on the Court's statutory analysis and conclusion that Solomon was ineligible. As the Court has explained, because statutory interpretation requires "apply[ing] the law's terms . . . no party may waive the proper interpretation of the law by failing to invoke it." S*tudents for Fair Admissions, Inc. v. President &*

*Fellows of Harvard Coll.*, 600 U.S. 181, 304 n.9 (2023) (internal brackets and quotation marks omitted). Under the Court's ruling in *Southwest General*, Subsection (b)(1) prohibits Ms. Habba from serving as Acting U.S. Attorney because her nomination for that position was submitted to the Senate.

Because *Southwest General* is binding authority, there is no need to address the government's futile analysis regarding the tense of the word "submits." *See* Gov't Br. at 26. But if this Court were forced to confront those arguments on a clean slate, it would conclude that the government's approach to statutory construction is not coherent.

The government's textual argument is wrong for multiple reasons. First, because Subsection 3345(a)(1) refers to the person serving as "first assistant" *at the time of the last Senate-confirmed official's departure*, it would have been impossible for the President to have "submitted" that person's nomination before Subsection 3345(a)(1) was triggered. The President does not submit a nomination before a vacancy arises, so using the word "submitted" rather than "submits" would have made little sense in that context. Second, if the only relevant question is the tense of "submit"—*i.e.*, whether the act of submission pre-dated or post-dated Ms. Habba's purported assumption of the Acting U.S. Attorney role—the act of *withdrawing* a nomination would be irrelevant. Under the government's theory of the text and text alone, the President did not actually need to withdraw Ms. Habba's nomination. It

was *submitted* before her purported assumption of the Acting U.S. Attorney position under subsection 3345(a)(1), regardless of if or when it was withdrawn.

The government likely recognizes the contradictions of its textual theory, so it combines its emphasis on the word "submits" with an emphasis on FVRA's supposed "purpose." Appx139–140. But setting aside the textual implausibility of the government's argument, looking to the "purpose" of the FVRA wholly discredits this theory rather than bolstering it. In the government's view, "[t]he purpose of subsection (b)(1) is to prevent the President from circumventing the Senate's advice-and-consent function by installing a pending nominee for an office on an acting basis *before the Senate can act* on the nomination." Appx139 (emphasis added). The government does not explain how it discerned this purpose, but the history behind the FVRA's enactment squarely repudiates the government's theory The offense that gave rise to the FRVA was the installation of Bill Lann Lee on an acting basis *after the Senate had the opportunity to act* on his nomination but chose not to. The purpose of the FVRA was to close the loophole that Ms. Habba now argues it opened.

The government's interpretation of Subsection 3345(b) has been roundly rejected by members of Congress in the past. In a 2023 letter to President Biden, thirteen members of the Senate Committee on Commerce, Science, and Transportation—including then-Senator J.D. Vance—informed the President that the acting administrator of NHTSA, Ann Carlson, was prohibited from serving in that

role under Subsection 3345(b)(1) because the President had *submitted* her nomination to the Senate and withdrawn it. *See* Letter from Members of the U.S. Senate Comm. on Com., Sci., & Transp. to President Joseph R. Biden, Jr. (Sept. 20, 2023), https://www.commerce.senate.gov/services/files/796C3233-2110-4A65-ADA3-4CFA39FDE167. The remedy prescribed in that letter applies with equal force to Ms. Habba: "To comply with the law, [the President] should immediately correct [his] violation of the law by removing [her] from her so-called acting [] position." *Id.*

### D. The Expiration of an Interim Appointment Under 546 Does Not Trigger the FVRA.

The relationship between the FVRA and 28 U.S.C. § 546 offers a *fourth* independent reason why Ms. Habba cannot serve as Acting U.S. Attorney under the FVRA. The government contends that when Ms. Habba ran out of authority after 120 days under 28 U.S.C. § 546, her resignation triggered the self-executing "first assistant" provision of Subsection 3345(a)(1) and propelled her right back into an "acting" role in the same office. Gov't Br. at 11. This theory is fundamentally incompatible with the text of the two statutes. When the Attorney General's power to fill a U.S. Attorney vacancy under Section 546 expires after 120 days, the sole mechanism for filling that vacancy is provided by subsection 546(d). And even if alternative mechanisms existed, the statutory provision upon which the government

has attempted to rely—5 U.S.C. § 3345(a)(1)—is triggered only by the departure of a Senate-confirmed official. Ms. Habba's resignation was not that.

Though the Attorney General has the power to invoke 28 U.S.C. § 546 to replace an Acting U.S. Attorney who had been serving under 5 U.S.C. § 3345(a), the lapsing of the Attorney General's 28 U.S.C. § 546 appointment does not re-trigger 5 U.S.C. § 3345(a). This order of operations is not a mere technicality. It is axiomatic that "a specific statute controls over a general one." *Bulova Watch Co. v. United States*, 365 U.S. 753, 758 (1961). "The general/specific canon is perhaps most frequently applied to statutes in which a general permission or prohibition is contradicted by a specific prohibition or permission[,] . . . [b]ut the canon has full application as well to statutes . . . in which a general authorization and a more limited, specific authorization exist side-by-side." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012).

That is precisely the relationship between 5 U.S.C. § 3345 and 28 U.S.C. § 546. Section 3345 provides the default mechanism for filling a vacancy in an executive agency office "*unless* another statute expressly provides a means for filling such a vacancy." *Hooks v. Kitsap Tenant Support Servs., Inc.*, 816 F.3d 550, 556 (9th Cir. 2016) (emphasis added). 28 U.S.C. § 546 is one such specific statute, as it expressly provides a means for filling a U.S. Attorney vacancy. "Thus, the President

is permitted to elect *between* these two statutory alternatives to designate an [acting officer]." *Id.* at 556 (emphasis added).

Here, the President (through the Attorney General) elected to use 28 U.S.C. § 546 to displace 5 U.S.C. § 3345. After the resignation of the Senate-confirmed U.S. Attorney for the District of New Jersey Philip Sellinger, First Assistant U.S. Attorney Vikas Khanna automatically assumed the post of Acting U.S. Attorney pursuant to 5 U.S.C. § 3345(a). Mr. Khanna continued to serve as Acting U.S. Attorney until the President (through the Attorney General) invoked 28 U.S.C. § 546 to appoint John Giordano as Interim U.S. Attorney. This move ended Mr. Khanna's tenure under Section 3345, as the "specific statute controls over [the] general one." *Bulova Watch Co.*, 365 U.S. at 758. A few weeks later, the President again invoked Section 546 to replace Mr. Giordano with Ms. Habba.

Even though subsection 546(d) plainly dictates what happens at the end of a section 546 appointment, the government now contends that 5 U.S.C. § 3345(a)— not 28 U.S.C. § 546—controls in this scenario. But under bedrock principles of statutory interpretation, 28 U.S.C. § 3345 and 5 U.S.C. § 546 are not engaged in a game of ping pong. Because the President chose to invoke the specific mechanism provided by 28 U.S.C. § 546 to override the "general rule" of 5 U.S.C. § 3345(a)(1), *SW General*, 580 U.S. at 288, section 546 controls as long as the position remains vacant. Section 3345 does not reemerge to somehow displace 28 U.S.C. § 546(d).

Subsection 546(d) is unambiguous about the one option when a section 546 appointment lapses: "the district court for such district may appoint a United States attorney to serve until the vacancy is filled." 28 U.S.C. § 546(d). When Congress amended 28 U.S.C. § 546 in 2007, it was aware of 5 U.S.C. § 3345(a), which Congress had enacted as part of the FVRA in 1998. Yet the statute makes no reference to 5 U.S.C. § 3345(a) or any other alternative mechanism for filling the vacancy.

The reading advanced by the government gives rise to difficult constitutional questions. Thorny separation-of-powers questions abound if—as the government contends—5 U.S.C. § 3345 is triggered by the lapsing of a 28 U.S.C. § 546 appointment. The district court's authority to appoint someone pursuant to subsection 546(d) is not time bound; it "may appoint" someone "*if* an appointment expires"—*i.e.*, if the President's nominee has not been confirmed by the Senate within 120 days of the Attorney General's invocation of 28 U.S.C. § 546(a). Consider the scenario where the Attorney General invokes her 28 U.S.C. § 546(a) authority to appoint an Interim U.S. Attorney to a 120-day term, but the district court does not immediately name a replacement when the term expires on day 120. According to the government's theory, 5 U.S.C. § 3345(a)(1) then dictates that the person serving as the First Assistant at that moment automatically becomes the Acting U.S. Attorney. But what if on day 121, the district court—pursuant to its

47

subsection 546(d) authority—names someone else to lead the office? Who is in charge? If it is the court's pick, which must be true given that 28 U.S.C. § 546 is the more specific statute, what happens if the President fires the court's subsection 546(d) appointee? Does the person serving as First Assistant at that time re-assume the role of Acting U.S. Attorney under 5 U.S.C. § 3345(a)(1)? And could the court, pursuant to its subsection 546(d) authority, then replace that person with someone else? The government's strained reading of the relationship between the two statutes pits the Judiciary and Executive Branch in perpetual tension, potentially creating difficult separation of powers questions.

## II. THE ATTORNEY GENERAL CANNOT RELY ON A "SPECIAL ATTORNEY" STATUTE TO DELEGATE SUPERVISION OVER THE U.S. ATTORNEY'S OFFICE TO MS. HABBA.

The government argues that even if the Executive Branch cannot appoint Ms. Habba as Acting U.S. Attorney under the FVRA, the Attorney General can cobble together a mix of delegation statutes that authorize Ms. Habba to "do ***anything*** the United States Attorney can do." Appx175 (emphasis and bolding in original). According to the government, Ms. Habba's designation as "Special Attorney" and "First Assistant" allows her to continue leading the U.S. Attorney's Office for the District of New Jersey, which includes prosecuting all cases and "supervis[ing] a staff of approximately 155 federal prosecutors and approximately 130 support

48

personnel."[10]  And government argues that Ms. Habba's authority to lead the office has no expiration date. Her appointment as "Special Attorney" is, according to her purported appointment, "indefinite." Appx161–162 (cite to appointment letter). But the Executive Branch's attempt install Ms. Habba as the U.S. Attorney in perpetuity is contrary to the text, structure, and history of the statutes governing temporary appointments.

Though the government concedes that the FVRA provides the exclusive means for appointing an Acting U.S. Attorney, it argues that there is no conflict between that exclusivity provision and Ms. Habba's purported delegation. Gov't Br. 33. The government contends that Ms. Habba's delegation comports with the FVRA because her delegation does not technically describe her as "acting" U.S. Attorney. According to the government, there is a theoretical distinction between serving as a "Acting officer" pursuant to the FVRA, which allows someone to perform "all functions associated with an office . . . including any nondelegable functions of the office," and "being delegated functions that are not *exclusive* to the office of U.S. Attorney." Yet the government maintains that not a single function of a U.S. Attorney is actually "exclusive" or "non-delegable," so there is no functional difference between Ms. Habba and an Acting U.S. Attorney. In the government's

---

[10] United States Attorney's Office, District of New Jersey, Meet the Acting U.S. Attorney and Special Attorney to the United States Attorney General. (Updated Sept. 1, 2025) https://www.justice.gov/usao-nj/meet-us-attorney.

view, the only true distinction is that unlike an Acting U.S. Attorney, Ms. Habba's authority to supervise the office never expires.

This district court rightly rejected the illusory line that the government tries to draw. It held that regardless of whether certain individual functions of a U.S. Attorney are "delegable," the Attorney General cannot delegate *all* of the functions and duties of a U.S. Attorney to a single individual who has not been confirmed by the Senate.[11] As the district court recognized, the government's theory would render obsolete the carefully crafted schemes of the FVRA, 28 U.S.C. § 546, and 28 U.S.C. § 541. Under the government's view of delegation, there would be no reason to ever appoint an Acting, Interim, or Senate-confirmed U.S. Attorney.

## A. The FVRA Precludes Ms. Habba From Leading the Office Pursuant to Delegation Statutes

The district court correctly held that the text of the FVRA's exclusivity provision bars the Attorney General from using general vesting and delegation statutes to afford Ms. Habba the powers of the U.S. Attorney for the District of New Jersey. Appx81–84. Section 3347(a) establishes that "Sections 3345 and 3346 are the *exclusive* means for temporarily authorizing an acting official to perform the

---

[11] The district court was also correct in concluding that because Ms. Habba's delegation is unlawful, she cannot supervise these cases. Appx80-81. It is of no moment that a narrower, lawful delegation might have hypothetically enabled Ms. Habba to supervise individual cases. "[I]f the delegation is unlawful, then so are all of its applications." Appx81.

functions and duties of any office of an Executive agency . . . unless a statutory provision *expressly* authorizes the President, a court, or the head of an Executive department, to designate an officer or employee to perform the functions and duties of a specified office temporarily in an acting capacity." 5 U.S.C. § 3347(1)(A) (emphasis added). The government does not argue that any of the delegation statutes upon which it relies provide such an "express[]" authorization. As the district court explained, "[t]he Government's 'Special Attorney' theory thus crashes headlong into this unambiguous barring provision." Appx82.

The government's contrary reading of the FVRA is difficult to parse. In attempting to sidestep the express textual bar of subsection 3347(a)(1), the government asserts that the FVRA's limitations are inapplicable because Ms. Habba's delegation did not technically purport to make her an "acting" U.S. Attorney. According to the government's myopic interpretation of section 3347, Ms. Habba is thus able to wiggle out of the restriction providing that sections 3345 and 3346 are the "exclusive" means for appointing *acting* officials. 5 U.S.C. § 3347(a)(1).

The government contends that "[t]he distinction between an acting official" and someone like Ms. Habba who is "exercising a vacant office's powers by delegation," is "significant"—*in theory*. Gov't Br. at 34. The government argues that unlike an acting official, an individual leading an office through delegation "cannot

exercise authority that is 'exclusive' to the office and thus non-delegable." *Id.* at 35. Conveniently, however, the government has determined that "exclusive/non-exclusive" distinction provides no functional limitation in the context of a U.S. Attorney's office. The government asserts that *every* function or duty of an office is delegable unless and until it is "specifically committed by statute exclusively to that office," and that Congress has not passed any such statute for U.S. Attorney's offices. *Id.* at 33.

Though the government cites several cases for its reading of section 3347, the district court aptly explained why none support the government's position. Appx87-89. The government contends that *Gonzales & Gonzales Bonds & Insurance Agency Inc. v. U.S. Dep't of Homeland Sec.*, 107 F.4th 1064, 1078 & n.7 (9th Cir. 2024), supports its theory of delegation, but *Gonzales* provides no indication that all "non-exclusive" functions are delegable. Instead, *Gonzales*'s ratification analysis undermines the Government's position that delegable duties can be undertaken by anyone, regardless of appointment. *Id.* 1076-77. The government's reliance on *Kajmowicz v. Whitaker*, 42 F.4th 138, 148 (3d Cir. 2022), is similarly inapposite. As the government acknowledges, the sole question in *Kajmowicz* turned on the interpretation of section 3348; the court never mentioned section 3347—or any other FVRA provision other than section 3348—in the analysis. And the district court thoroughly articulated why the definitions in section 3348 do not govern section

3347. *See* Appx87. Lastly, though *Arthrex, Inc. v. Smith & Nephew, Inc.*, 35 F.4th 1328, 1338 (Fed. Cir. 2022), applied the section 3348 definition of "functions and duties" to the entire statute, that was a profound analytical misstep for the reasons the district court laid bare. Appx88-90.

The government's sweeping view of delegation power would render superfluous the entire FVRA, as well as 28 U.S.C. § 546(d). Under the government's interpretation of section 3347, Congress must explicitly delineate which functions are exclusive to each of the approximately 1,000 PAS offices in the federal government if it hopes to set any limitations on who may exercise the powers of those offices. If that theory is correct, enacting the FVRA was a futile undertaking. Unless Congress could pass *additional* laws specific to each office, the FVRA did not set a single restriction on either (1) who was eligible to lead a PAS office without Senate confirmation, or (2) how long they could lead such an office. But the passage of the FVRA was not necessary for Congress to pass *additional* laws limiting the scope of temporary service. Moreover, according to the government's theory of delegation, there is no coherent reason why any past administration has *ever* installed a temporary U.S. Attorney the FVRA, which sets rigid time and eligibility limitations on temporary service. Delegation would have provided all of the benefits without any of the burdens.

Nor would the Executive have any reason to rely on 28 U.S.C. § 546, which

sets a 120-day limit on the Attorney General's power to appoint an Interim U.S. Attorney and provides that an individual whose nomination failed in the Senate is ineligible to serve. If the Attorney General could rely on delegation to confer the full panoply of a U.S. Attorney's powers to whomever she wants for as long as she wants, there would be no reason for her to ever rely on 28 U.S.C. § 546, as she did in this case when she initially installed Ms. Habba as Interim U.S. Attorney.

If the lack of a specific statute defining the "exclusive" powers of a U.S. Attorney meant that there were no time or eligibility restrictions on a non-Senate-confirmed individual's exercise of the functions and duties U.S. Attorney, Congress would have known as much when it passed section 546. But as mentioned, Congress amended section 546 in 2007 to re-install the 120-day time limitation on temporary service that it lifted a year earlier. *See supra* at 11. It did so because it was concerned about instances where an individual had led a U.S. Attorney's Office for 120-days without Senate confirmation. *See* H.R. Rep. No. 110-58 at 6 (2007). According to the government's theory, however, this amendment did nothing to prevent the problem that Congress intended to cure. An individual without Senate confirmation could still—via delegation—lead a U.S. Attorney's office for an unlimited number of days.

The government's theory of delegation similarly means that the FVRA failed to close the precise loophole that it was enacted to eliminate: The Attorney General's

use of delegation statues to install temporary leaders of PAS offices. The Congressional record makes plain that both parties of Congress believed the FVRA accomplished the goal prevent the Attorney General from relying on sections 509 and 510 to appoint temporary PAS officers:

> [I]n an effort to squarely address past problems, the Act specifically prohibits the use of general, ''housekeeping'' statutes as a basis for circumventing the Vacancies Act. Provisions such as, but not limited to, 28 U.S.C. 509 and 510, which vest all functions of the Department of Justice in the Attorney General and allow the Attorney General to delegate responsibility for carrying out those functions, shall not be construed as providing an alternative means of filling vacancies.

151 Cong. Rec. S12824 (daily ed. Oct. 21, 1998) (Statement of Sen. Fred Thompson); S. Rep. No. 105-250, at 17 ("[Section 3347] *forecloses the argument raised by the Justice Department* that sections 28 U.S.C. §§ 509 and 510, rather than the Vacancies Act, apply to vacancies in that department." (emphasis added)). It is widely recognized that the impetus behind the FVRA was the Attorney General's use of delegation statutes to appoint Bill Lann Lee "to serve as Acting [officer], immediately after the Senate refused to confirm him for that very office." *SW General*, 580 U.S. at 295; *see* Stephen Migala, *The Vacancies Act and a Post-Vacancy First Assistant of USCIS* at 12–13 (Sept. 9, 2019), https://ssrn.com/abstract=3450843 (internal citations omitted); Steven J. Duffield & James C. Ho, *The (Still) Illegal Appointment of Bill Lann Lee*, Comment, 3 Tex. Rev. L. & Pol. 403 (1999).

But the Attorney General now claims the very power that the FVRA was enacted to preclude her from exercising. That cannot be the correct reading of the statute. As Justice Story explained nearly two centuries ago, "every statute is to be expounded reasonably, so as to suppress, and not to extend, the mischief which it was designed to cure." *Sherwood v. Sutton*, 21 F.Cas. 1303, 1307 (No. 12,782) (C.C.D.N.H. 1828). "Courts should remember that "[l]egislation has an aim; it seeks to obviate some mischief." Felix Frankfurter, *Some Reflections on the Reading of Statutes*, 47 Colum. L. Rev. 527, 538–539 (1947). *See also* Samuel L. Bray, *The Mischief Rule*, 109 Geo. L.J. 967, 968 (2021) ("The mischief rule instructs an interpreter to consider the problem to which the statute was addressed, and also the way in which the statute is a remedy for that problem. ... [T]he generating problem is taken as part of the context for reading the statute.").

### a. No "Special Attorney" Has Ever Exercised the Authority that Ms. Habba Claims.

No "Special Attorney" has ever exercised the authority that Ms. Habba purports to wield. Special Attorney statutes have historically been used to delegate the authority on specific cases or categories of cases. *See, e.g.*, Office of the Attorney General, Order No. 5559-2022, *Appointment of John L. Smith as Special Counsel* (authorizing special counsel to investigate "efforts to interfere with the lawful transfer of power following the 2020 presidential election" as well as conduct related to the former President's mishandling of classified materials); Office of the

Attorney General, Order No. 5730-2023, *Appointment of David C. Weiss as Special Counsel* (authorizing special counsel to investigate an individual for potential gun and tax offenses, as well as matters related to that conduct); Office of the Attorney General, Order No. 5588-2023, *Appointment of Robert K. Hur as Special Counsel* (authorizing special counsel to investigate "possible unauthorized removal and retention of classified documents or records" by the former Vice President and any related matters).

The Attorney General invoked 28 U.S.C. § 515 as the statutory basis for Ms. Habba's "Special Attorney" authority. Yet section 515's authority is limited to legal proceedings, not office leadership. Section 515, titled "Authority for *legal proceedings*; commission, oath, and salary for special attorneys," provides that the Attorney General can direct a Special Attorney to "conduct any kind of legal proceeding." 28 U.S.C. § 515(a). This is vastly different from the authority Ms. Habba claims—the authority to lead the office and supervise all prosecutions. "Any *kind* of proceeding" is moored to the purpose of the statute—to allow the Attorney General to appoint a Special Attorney to conduct some category or type of cases. Instead of being directed to conduct some specific category of cases, Ms. Habba, by the government's own admission, is "lead[ing] the office." Gov't Br. at 29.

**B. The Attorney General's Delegation Authority Cannot Be Unlimited.**

The government's unconstrained interpretation of section 510 runs headlong

into both statutory and constitutional issues. Under the government's theory of unlimited delegation, the Attorney General, as "head of the Department of Justice," 28 U.S.C. § 503, vested with "[a]ll functions" of DOJ's officers, agencies, and employees, *id.* § 509, could delegate to Ms. Habba—an individual who has never been confirmed by the Senate—to supervise the FBI, DEA, ATF, and every U.S. Attorney's office in the country. Under the "basic tenet of statutory construction that courts should interpret a law to avoid absurd or bizarre results," *Encompass Ins. Co. v. Stone Mansion Rest. Inc.*, 902 F.3d 147, 152 (3d Cir. 2018), the government's theory of unlimited delegation cannot be the correct reading of section 510.

## CONCLUSION

The Court should affirm the district court's disqualification orders.

Dated: October 6, 2025                    Respectfully Submitted,

*/s/ Gerald Krovatin*                      */s/ Abbe David Lowell*
Gerald Krovatin                           Abbe David Lowell
KROVATIN NAU LLC                          David A. Kolansky
60 Park Place, Suite 1100                 Isabella M. Oishi
Newark, NJ 07102                          John P. Bolen
T: (973) 424-9777                         LOWELL & ASSOCIATES, PLLC
F: (973) 424-9779                         1250 H Street, N.W., Suite 250
gkrovatin@krovatin.com                    Washington, DC 20005
                                          T: (202) 964-6110
Norman L. Eisen                           F: (202) 964-6116
Joshua Kolb                               ALowellPublicOutreach@

DEMOCRACY DEFENDERS FUND                    lowellandassociates.com
600 Pennsylvania Avenue S.E.
Suite 15180
Washington, DC 20003
T: (202) 594-9958
norman@statedemocracydefenders.org

_____

**CERTIFICATE OF COMPLIANCE**

1.    Mr. Pina's counsel are members of the bar of this Court.

2.    This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,994 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Times New Roman 14-point font, a proportionally spaced typeface.

3.    The text of the electronic version of this document is identical to the text of the hard copies that will be provided.

4.    This document was scanned for viruses with the most recent version of Microsoft Defender Antivirus, which is continuously updated, and according to that program is free of viruses.


                                        /s/ *Abbe David Lowell*

                                        Abbe David Lowell, Esq.