Case Nos. 25-2635 & 25-2636

# 𝔘nited 𝔖tates 𝔆ourt of 𝔄ppeals
# for the
# 𝔗hird 𝔆ircuit

UNITED STATES OF AMERICA,

*Plaintiff-Appellant,*

v.

JULIEN GIRAUD, JR., JULIAN GIRAUD III, CESAR HUMBERTO PINA

*Defendants-Appellees*

On Appeal from the United States District Court for the District of New Jersey,
Nos. 1:24-cr-768, 2:25-cr-436 (Brann, C.J. (M.D. Pa.))

**BRIEF OF APPELLEE JULIEN GIRAUD, JR.**
**IN SUPPORT OF AFFIRMANCE**

THOMAS S. MIRIGLIANO, ESQ.
Law Office of Thomas S. Mirigliano, Esq., P.C.
40 Wall Street, 32nd Floor
New York, New York 10005
(718) 530-6548
TSM@MiriglianoLaw.com
*Attorneys for Defendant Julien Giraud Jr.*

MARTIN CRONIN, Esq.
Lawyers for the Rule of Law
5 Columbus Circle, Suite 1501
New York, New York 10019

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................................iii

INTRODUCTION ........................................................................................... 1

STATEMENT OF ISSUES ............................................................................. 3

STATEMENT OF THE CASE AND OF THE FACTS ........................................ 3

    A. STATUTORY FRAMEWORK……………………………………………..3

     B. FACTUAL BACKGROUND……………………….…………………..6

     C. PROCEEDINGS BELOW……….………………………….……………..9

SUMMARY OF ARGUMENT ........................................................................ 10

ARGUMENT ................................................................................................ 13

I.   THE DISTRICT COURT PROPERLY HELD THAT MS. HABBA IS NOT VALIDLY SERVING AS ACTING U.S. ATTORNEY…………..………..…13

A. MS. HABBA CANNOT SERVE AS ACTING U.S. ATTORNEY BECAUSE SHE WAS PREVIOUSLY NOMINATED FOR THE POSITION OF U.S. ATTORNEY………..…….…14

B. THE DISTRICT COURT CORRECTLY FOUND MS. HABBA INELIGIBLE UNDER THE FVRA BECAUSE SHE WAS NOT THE FIRST ASSISTANT WHEN THE VACANCY AROSE…………………………………………………………………….29

II.   THE DISTRICT COURT PROPERLY HELD THAT THE ATTORNEY GENERAL MAY NOT DELEGATE TO MS. HABBA THE AUTHORITY TO PERFORM THE FUNCTIONS AND DUTIES OF THE U.S. ATTORNEY'S OFFICE……. ..................................................................................34

A. THE ATTORNEY GENERAL'S OTHERWISE BROAD SUPERVISORY AUTHORITY DOES NOT PERMIT INSTALLING A "DE FACTO" U.S. ATTORNEY BY DELEGATION……………………………………………………………………..35

B. THE FVRA'S EXCLUSIVITY PROVISION, 5 U.S.C. § 3347(A), FORECLOSES THE GOVERNMENT'S DELEGATION THEORY……………………….…………………36

CONCLUSION ................................................................................47

CERTIFICATE OF COMPLIANCE ....................................................48

## TABLE OF AUTHORITIES

### CASES

#### UNITED STATES SUPREME COURT

*Ashwander v. Tenn. Valley Auth.,* 297 U.S. 288, 341 (1936)…………………..…45

*Buckley v. Valeo, 424 U.S. 1 (1976)*……………........……..……………….............4

*Carr v. Saul,* 593 U.S. 83 (2021)………………….....……..……………….........31

*Corely v. United States,* 593 U.S. 83 (2021)……....……...……………….....16 n.3

*DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council,* 485 U.S. 568 (1988) ......................................................................................................................45

*Duncan v. Walker,* 533 U.S. 167 (2001)...……....…………………......................42

*Edmond v. United States,* 520 U.S. 561 (1997)...……....…….…………................5

*Hewitt v. United States,* 145 S. Ct. 2165 (2025) ................................................... 31

*Jennings v. Rodriguez,* 583 U.S. 281 (2018) ........................................................ 45

*Kisor v. Wilkie,* 588 U.S. 558 (2019)…………..…………...……….................23

*Loper Bright Enters., Inc. v. Raimondo,* 603 U.S. 369 (2024)……….....................23

*Lucia v. SEC,* 585 U.S. 237 (2018)…….....……….....……………...………...............4

*NLRB v. Noel Canning, 573 U.S. 513 (2014)* .................................................17 n.4

*NLRB v. SW General, Inc.,* 580 U.S. 288 (2017)…....…..4, 14, 19-20, 22, 26, 29, 31

*Nichols v. United States,* 578 U.S. 104 (2016)...……...………......15, 16 n.2, 31 n.8

*Russello v. United States*, 464 U.S. 16 (1983) ...................................................... 19

*TRW, Inc. v. Andrews*, 534 U.S. 19 (2001) ...........................................................21

*United States v. Arthrex, Inc.*, 592 U.S. 1 (2021) ...................................................... 4

*Weiss v. United States*, 510 U.S. 163 (1994) ........................................................... 4

### UNITED STATES COURT OF APPEALS

*Arthrex v. Smith & Nephew, Inc.,* 35 F.4th 1328 (Fed. Cir. 2022)…………..........44

*Belhas v. Ya'alon,* 515 F.3d 1279 (D.C. Cir. 2008)…......……..…..................16 n.2

*Cuccinelli, L.M.-M. v.,* 442 F. Supp. 3d 1 (D.D.C. 2020)…….…….5, 14, 19-20, 27

*Doolin Security Sav. Bank, FSB v. OTS,* 139 F.3d 203 (D.C. Cir. 1998) …..…......46

*Gonzales & Gonzales Bonds & Ins. Agency, Inc. v. DHS*, 107 F.4th 1064 (9th Cir. 2025)…………………………………………………………………..…..44

*Guedes v. BATFE*, 920 F.3d 1 (D.C. Cir. 2019) .................................................... 15

*Hooks v. Kitsap Tenant Support Servs., Inc.,* 816 F.3d 550 (9th Cir. 2016) …………………………………………………………………14-15, 23, 44

*Kajmowicz v. Whitaker*, 42 F.4th 138 (3d Cir. 2022) .......................................43-44

### UNITED STATES DISTRICT COURTS

*United States v. Garcia,* No. 2:25-cr-240, 2025 U.S. Dist. LEXIS 194389* (D. Nev. Sept. 30, 2025) ..........................................................18 n.5, 21-24, 26-27, 40

*Williams v. Phillips*, 360 F. Supp. 1363 (D.D.C. 1973) ....................................... 27

### FEDERAL RULES AND STATUTES

5 U.S.C. §§ 3345–3349 .................................................................................passim

5 U.S.C. § 3345(a)(1)...…….………….……………...………….9-22, 25-26, 28, 40

5 U.S.C. § 3345(a)(2)…..……………………..……….....5, 14, 19-21, 25, 27, 35

5 U.S.C. § 3345(a)(3)...……………………………………….……...14, 18-20

5 U.S.C. § 3345(a)(3)(A).……………………………………….…………… 19

5 U.S.C. § 3345(b)(1)....…………………………….....…...… 11, 19-20, 29-32

5 U.S.C. § 3345(b)(1)(A).…………………….…......................................… 19

5 U.S.C. § 3346……..……………………………….……….………5, 24, 36

5 U.S.C. § 3347 .................................................................................. passim

5 U.S.C. § 3347(a) .................................................................5, 36, 39, 43

5 U.S.C. § 3347(b) .................................................................10, 36-40, 42-43

5 U.S.C. § 3348(a)(2) ........................................................................ 42

28 U.S.C. § 508 ........................................................................42

28 U.S.C. §§ 509–510 ................................................................... passim

28 U.S.C. § 515 ................................................................ 6, 9-11, 35-36, 40

28 U.S.C. § 518 ......................................................................... 35

28 U.S.C. § 541 ................................................................. 5, 12, 39

28 U.S.C. § 546……..…………………………….…………………..…….. passim

28 U.S.C. § 546(d) ...................................................... 5, 7, 12, 34-35, 40

UNITED STATES CONSTITUTION

U.S. Const., Art. II, § 2, cl. 2……………………………….……….…..............3

LEGISLATIVE MATERIALS

S. Rep. No. 105-250 (1998) ............................... 5, 24, 25 n.7, 30, 37, 39, 42-43, 45

144 Cong. Rec. S6413–6414 (June 16, 1998) .................................................. 39, 45

144 Cong. Rec. S11024 (Sept. 28, 1998) ............................................................ 24

144 Cong. Rec. S11037 (Sept. 28, 1998) ............................................................ 24

145 Cong. Rec. S33 (Jan. 6, 1999) ....................................................................... 39

Vacancies Act of 1868, ch. 227, 15 Stat. 168 (1868) ……...…….. 27, 37-39, 45-46

SECONDARY SOURCES

Stephen Migala, *The Vacancies Act and Post-Vacancy First Assistant of USCIS* (Sep. 19, 2019)……………………………………………..…………18, 24, 37-38

The Federalist No. 76 (Alexander Hamilton) (C. Rossiter ed., 1961) .................... 4

REGULATIONS AND OTHER AUTHORITIES

Letter from Sen. Strom Thurmond to Atty. Gen. Janet Reno (Jan. 23, 1998), *reprinted in Ovrersight of the Implementation of the Vacancies Act: Hearing on S. 2176 Before the S. Comm. on Governmental Affairs*, 105th Cong. .................38 n.11

Tracey Tully & Jonah E. Bromwich, *Showdown in New Jersey Over Top Federal Prosecutor*, N.Y. Times, July 22, 2025……………………………………………… 7

# **INTRODUCTION**

The Federal Vacancies Reform Act ("FVRA"), 28 U.S.C. § 3345 *et seq*., is the most recent in a line of statutes—dating back to 1792—enacted to address temporary gaps in leadership of government offices requiring Senate confirmation. The consistent aim of these laws has been to permit interim officials to step in when an office becomes vacant due to death, resignation, or inability to serve, but only for a limited period and solely to ensure continuity of government operations while the Senate considers a permanent nominee. From as early as 1795, Congress recognized the risk of executive abuse and therefore imposed explicit time limits and narrow categories of individuals who could serve in an acting capacity.

This appeal addresses whether the Executive Branch may sidestep Congress's carefully crafted framework for filling vacancies in Senate-confirmed offices and install its preferred prosecutor by contrivance. The District Court correctly held that it may not.

When Alina Habba's interim appointment under 28 U.S.C. § 546(c) expired, the statute vested the District Court with the authority to appoint an interim United States Attorney. The District Court exercised that authority, naming career prosecutor, Desiree Grace. Instead of respecting that lawful appointment pending Senate confirmation of the President's nominee for the position, the Executive orchestrated a series of extraordinary maneuvers—withdrawing Ms. Habba's

1

pending nomination, arranging her resignation, immediately reappointing her as "Special Attorney" and "First Assistant," and then invoking the FVRA to elevate her once more—to illegally undermine the District Court's lawful appointment and instead reinstall her as the U.S. Attorney for the District of New Jersey.

The Government now defends that scheme with recycled—and previously rejected—arguments that would rewrite the FVRA's eligibility provisions and expand vesting-and-delegation statutes far beyond their text. Indeed, adopting the Government's reading of the FVRA and related statutes would permit the Executive to perpetually install an individual the Senate has not confirmed, and likely would not confirm, as the head of a U.S. Attorney's Office. Such an outcome defies Congress's carefully drawn framework and consolidates the appointment power solely in the Executive—which is precisely what the Framers and Congress sought to prevent.

At stake here is not merely who supervises this prosecution or others in the District of New Jersey, but also the structural integrity of the federal appointments process. This Court should not sanction such an erosion of constitutional structure. The District Court's disqualification order properly vindicated Congress's statutory framework and the Constitution's separation of powers. It should be affirmed.

## STATEMENT OF THE ISSUES

1.     Whether the District Court correctly held that Ms. Habba is not lawfully serving as the Acting U.S. Attorney for the District of New Jersey pursuant to the FVRA.

Standard of Review: This is a question of law subject to plenary review.  Any underlying factual findings are reviewed for clear error only.

2.     Whether the District Court correctly held that the Attorney General's attempt to delegate to Ms. Habba all of the supervisory powers of the U.S. Attorney's Office was illegal.

Standard of Review: This is a question of law subject to plenary review.  The District Court's factual findings, including its finding that the Attorney General delegated all of the powers of an Acting United States Attorney to Ms. Habba with the express purpose of making her the *de facto* U.S. Attorney, is reviewed for clear error only.

## STATEMENT OF THE CASE AND OF THE FACTS

### A. STATUTORY FRAMEWORK

The Appointments Clause vests the President with the authority to appoint "Officers of the United States" "by and with the Advice and Consent of the Senate." U.S. Const. art II, § 2, cl. II.  An "Officer of the United States," unlike a non-officer employee, is any appointee who exercises "significant authority pursuant to the laws

of the United States" in a continuing position established by law. *Buckley v. Valeo*, 424 U.S. 1, 126 (1976); *Lucia v. SEC*, 585 U.S. 237, 245 (2018) (internal citations omitted); *Edmond v. United States*, 520 U.S. 561, 662 (1997).    Presidential nomination and Senatorial confirmation are the "default manner of appointment" for principal and inferior officers. *United States v. Arthrex, Inc.,* 592 U.S. 1, 12 (2021).

The Senate's advice-and-consent power is a core "structural safeguard[] of the constitutional scheme." *Edmond*, 520 U.S. at 659.  The Framers deliberately divided the appointment power between the Executive and Legislative branches to guard against presidential favoritism, "prevent the appointment of unfit characters," and promote administrative stability. *NLRB v. SW General, Inc.,* 580 U.S. 288, 293 (2017) (citing The Federalist No. 76, at 457 (Alexander Hamilton) (C. Rossiter ed., 1961)); *see also Weiss v. United States*, 510 U.S. 163, 187 (1994) (Souter, J., concurring) ("any decision to dispense with Presidential Appointment and Senate Confirmation is Congress's to make, not the President's").

To address the practical difficulties caused by vacancies, Congress has, since the founding, enacted statutes authorizing temporary acting service to maintain continuity in government operations while preserving the Senate's confirmation prerogative. *SW General,* 580 U.S. at 294.  These vacancy statutes provide a mechanism for the performance of an office's duties and functions during the period when a permanent officer is being nominated and confirmed. *Id.*

Under federal law, United States Attorneys are appointed by the President with the advice and consent of the Senate. 28 U.S.C. § 541(a). When a vacancy arises in the office of U.S. Attorney, Congress has enacted two tightly cabined mechanisms for temporarily filling the office.

The first is the FVRA, which establishes the default framework for temporarily filling vacancies in positions requiring Presidential appointment and Senate confirmation ("PAS" offices). *See* 5 U.S.C. §§ 3345 *et seq.*; *L.M.-M v. Cuccinelli*, 442 F.Supp.3d 1, 24 (D.D.C. 2020). It serves as the *exclusive* statutory mechanism by which acting officials may temporarily assume duties and functions of PAS offices, except where another statutory provision expressly provides an alternative method. *See* 5 U.S.C. § 3347(a). The FVRA imposes strict time limits and eligibility restrictions on acting service. *See e.g.*, §§ 3345(a)(2)-(3); (b)(1); 3346.

The second is the U.S. Attorney-specific vacancy statute, 28 U.S.C. § 546. That statute authorizes the Attorney General to appoint an interim U.S. Attorney for no more than 120 days. *Id*. § 546(a). If the vacancy persists thereafter, the appointment authority passes to the judges of the relevant district court. *Id*. § 546(d).

Together, these provisions embody Congress's careful balance between continuity of government and the Senate's advice and consent role. *See* S. Rep. No. 105-250, at 3 (1998).

Separate from these vacancy provisions, Congress has also conferred upon the Attorney General substantial authority to delegate certain functions and responsibilities within the Department of Justice ("DOJ").  Under 28 U.S.C. § 509, all functions performed by DOJ officers, agencies, and employees are "vested in the Attorney General," subject to limited exceptions not relevant here.  Section 510 authorizes the Attorney General to "make such provisions as [she] considers appropriate authorizing the performance by any other officer, employee, or agency of the Department of Justice of any function of the Attorney General." *Id*. § 510.  Finally, § 515 empowers the Attorney General—or any other DOJ officer or specially appointed attorney—to "conduct any kind of legal proceeding, civil or criminal." when specifically directed by the Attorney General to do so. *Id*. § 515.

While these provisions allow internal delegation of specific duties, they do not authorize the Attorney General to bypass the FVRA or § 546 to install a "*de facto*" U.S. Attorney.  Their purpose is to permit performance of particular functions, not wholesale substitution of officers or circumvention of Congress's carefully constructed appointment framework.

**B.  FACTUAL BACKGROUND**

On November 21, 2024, a federal grand jury returned a three-count indictment against Julien Giraud, Jr. and Julien Giraud, III, signed by Philip R. Sellinger, the Senate-confirmed United States Attorney for the District of New Jersey.  Appx30.

On January 8, 2025, Mr. Sellinger resigned. *Id.*   Under the FVRA, his First Assistant, Vikas Khanna, automatically became Acting U.S. Attorney. *Id*.

On March 3, 2025, Attorney General Pamela Bondi exercised her authority under 28 U.S.C. § 546(a) to appoint John Giordano as interim U.S. Attorney. Appx30-31.   Approximately three weeks later, on March 28, 2025, the Attorney General issued an order replacing Mr. Giordano with Alina Habba. *Id*.

President Donald Trump formally nominated Ms. Habba for permanent appointment on June 3, 2025. Appx32.   Her nomination stalled in the Senate amid opposition from both New Jersey senators. *See* Tracey Tully and Jonah E. Bromwich, *Showdown in New Jersey Over Top Federal Prosecutor*, N.Y. Times, July 22, 2025, available at https://nytimes.com/2025/07/22/nyregion/alina-habba-nj-us-attorney.html (last visited October 5, 2025).   Meanwhile, her 120-day interim term under § 546(a) was approaching its expiration.   Though not relevant to this appeal, there remains some dispute concerning the exact timing of the 120-day clock limiting Ms. Habba's term as interim U.S. Attorney. Appx.31-33.   In anticipation of the end of Ms. Habba's term, the judges of the United States District Court for the District of New Jersey invoked their authority under § 546(d) and appointed Desiree Grace, a career prosecutor and Ms. Habba's First Assistant, as interim U.S. Attorney, effective on the later of July 22, 2025, or the expiration of Ms. Habba's 120-day appointment. Appx32-33.

As Chief Judge Matthew W. Brann of the District Court for the Middle District of Pennsylvania later observed, the Trump Administration "was not pleased" with the New Jersey District Court's decision to appoint Ms. Grace. Appx33. Rather than accept that statutorily authorized outcome, pursue another lawful avenue under the FVRA, or await Senate confirmation, senior officials at the Department of Justice ("DOJ"), including the Attorney General herself, responded by baselessly attacking the integrity of the New Jersey federal judiciary and developing a plan to keep Ms. Habba in control of the office despite the expiration of her lawful authority. Appx34.

Following the appointment of Ms. Grace by the district court, the plan was quickly set in motion. First, in defiance of the court's appointment order, Ms. Grace was terminated from her employment with DOJ on July 22, 2025.[1] Appx23. Then, on July 24, Ms. Habba's nomination was formally withdrawn, and she tendered her resignation as interim U.S. Attorney. Appx34-35. That same day, the Attorney General named Ms. Habba as both "Special Attorney to the Attorney General" and "First Assistant U.S. Attorney." Appx35. According to the Administration, this sequence of maneuvers automatically made Ms. Habba the Acting U.S. Attorney

---

[1] Ms. Grace has challenged her termination without cause as violating her civil service protections. *See* Civil Service Merits Board Complaint, available at https://www.mspb.gov/foia/files/DesireeGracevDeptofJusticeDC-0752-25-3347-I-1-508.pdf (last visited October 5, 2025) (alleging that her "termination was completely unjustified and was in direct retaliation for the District Court appointing me as United States Attorney pursuant to 28 U.S.C. § 546. I have received outstanding reviews and have been promoted numerous times on merit.")

under § 3345(a)(1) of the FVRA, and failing that, would otherwise grant her the authority to run the U.S. Attorney's Office in New Jersey pursuant to the Attorney General's general vesting and delegation powers set forth in 28 U.S.C. §§ 509, 510, 515. Appx35. On July 26, 2025, Ms. Grace was officially removed by order of the President. Appx36.

On July 27, 2025, defendant-appellees Julien Giraud, Jr. and Julien Giraud, III moved to dismiss the indictment against them and to disqualify Ms. Habba, along with all Assistant U.S. Attorneys acting under her supervision. Appx36-38. By Order of this Court, the Giraud matter was assigned to Chief Judge Brann for resolution of the then-pending motion and was subsequently consolidated with the unrelated case of defendant-appellee Cesar Pina, who had filed a similar motion seeking the same relief. Appx37.

## C. PROCEEDINGS BELOW

After full briefing and oral argument, Chief Judge Brann issued a detailed Memorandum Opinion on August 21, 2025, holding that Ms. Habba "has unlawfully acted in the role of the United States Attorney for the District of New Jersey since July 1, 2025," Appx98. The key findings underlying Chief Judge Brann's decision were: (1) the Attorney General's interim appointment authority under § 546(a) expired after a single 120-day term; (2) Ms. Habba was ineligible to serve under § 3345(a)(1) of the FVRA because she was not First Assistant at the time the vacancy

arose; and (3) the Government's fallback "delegation" theory under §§ 509, 510, and 515 was foreclosed by the FVRA's exclusivity provision (§ 3347(b)). Appx41-42, 57, 74-76, 81-83, 95.

Accordingly, Chief Judge Brann disqualified Ms. Habba "from engaging in the prosecutions of the Girauds and Mr. Pina, and from supervising the same[,]" but denied dismissal of the indictments. Appx104.

The Government appealed, and the matter is now properly before this Court.

## SUMMARY OF ARGUMENT

This appeal presents a straightforward application of the FVRA and its structural safeguards against executive circumvention of Senate confirmation. The District Court correctly held that Ms. Habba's service as Acting U.S. Attorney for the District of New Jersey was unlawful. The Government's attempt to expand § 3345(a)(1) beyond its text and history—so that the Attorney General may hand-pick a successor and retroactively deem that person a "First Assistant"—is irreconcilable with the FVRA's design, its legislative history, and bedrock separation-of-powers principles.

First, Ms. Habba was ineligible to serve under the FVRA because she was not the First Assistant at the time the vacancy arose and was otherwise barred from acting service because she had been formally nominated for the permanent position. Section 3345(a)(1) authorizes automatic acting service only for the individual

serving as First Assistant at the moment the office becomes vacant, which occurs upon the prior PAS officer's death, resignation, or inability to serve. That self-executing limitation is the statute's principal safeguard against post-vacancy manipulation. Ms. Habba did not occupy that office when United States Attorney Philip Sellinger resigned on January 8, 2025; Vikas Khanna did. Her later designation as "First Assistant" on July 24, more than six months after the vacancy occurred, could not trigger § 3345(a)(1)'s automatic ascension mechanism. Nor could the Executive evade the statutory bar imposed by § 3345(b)(1), which forbids a nominee to a vacant PAS office from serving in that same role after her nomination has been submitted. Congress enacted that restriction precisely to prevent the Executive from installing its preferred nominee as a *de facto* officer while the Senate's confirmation process is pending. The Government's contrary reading of these provisions would nullify their limits and convert the FVRA into a boundless appointment power that Congress never authorized.

Second, the Government's "delegation" theory cannot rescue an invalid appointment. Sections 509, 510, and 515 confer general authority on the Attorney General to supervise and direct litigation—not to override statutory succession rules. As Congress made explicit in § 3347(b), the FVRA is the *exclusive* means of filling vacancies in PAS offices unless another statute expressly provides an alternative. The Attorney General cannot evade § 3347(b) by cloaking an ineligible nominee

11

with the title of "Special Attorney" or "First Assistant" and purporting to delegate to her "all the powers of a U.S. Attorney." That maneuver collapses the constitutional boundary between delegation of duties and appointment to office, renders § 541 meaningless, and directly contravenes both the text and purpose of the FVRA.

This case is not merely about statutory construction. It implicates the structural and constitutional balance of power among the branches. Congress enacted the FVRA to restore the Senate's role in the appointment of PAS officers and to prevent precisely the type of executive manipulation at issue here. By designating Habba as "First Assistant" after the vacancy arose, withdrawing her nomination, and proclaiming her "Acting U.S. Attorney" by automatic operation of § 3345(a)(1), the Executive attempted to nullify the Senate's advice-and-consent functions and the district court's statutory appointment authority under 28 U.S.C. § 546(d). That scheme intrudes upon legislative prerogatives, undermines judicial independence, and jeopardizes the separation of powers among our three branches of government. Upholding the District Court's disqualification order thus preserves not only the FVRA's textual boundaries but also the separation of powers on which the legitimacy of federal prosecutions depends.

# **ARGUMENT**

## I. **THE DISTRICT COURT PROPERLY HELD THAT MS. HABBA IS NOT VALIDLY SERVING AS ACTING U.S. ATTORNEY**

The Government contends that the District Court erred in concluding that Ms. Habba is not lawfully serving as the Acting U.S. Attorney for the District of New Jersey under the FVRA. The Government is mistaken. There are three distinct reasons why Ms. Habba is not validly serving as the Acting U.S. Attorney. First, as the District Court correctly held, only the person serving as first assistant at the time the vacancy arises may assume the role of Acting U.S. Attorney under § 3345(a)(1). Second, the Administration's orchestrated removal of Ms. Grace as First Assistant cannot manufacture an FVRA vacancy to elevate Ms. Habba after the fact. Third, Ms. Habba is separately barred from acting service under § 3345(b)(1) because she was previously nominated by the President to serve as U.S. Attorney for the District of New Jersey. The Government's efforts to circumvent these statutory constraints through Ms. Grace's dismissal and Ms. Habba's *post-hoc* designation finds no support in the FVRA or the Constitution. The District Court therefore correctly held that Ms. Habba is not lawfully serving as Acting U.S. Attorney.

**A. THE DISTRICT COURT CORRECTLY FOUND MS. HABBA INELIGIBLE UNDER THE FVRA BECAUSE SHE WAS NOT THE FIRST ASSISTANT WHEN THE VACANCY AROSE**

The Government argues that Ms. Habba became the Acting U.S. Attorney on July 26, 2025, "by automatic application of § 3345(a)(1)" after being designated as First Assistant by the Attorney General at a time the office was purportedly "vacant." Govt. Br., 11, 17-18. The Government's position is untenable, as it cannot be squared with the FVRA's text, structure, or legislative history.

The FVRA narrowly defines who may temporarily perform the duties of a vacant PAS office. *See* 5 U.S.C. § 3345(a). A PAS office becomes "vacant" only when the last PAS officer "dies, resigns, or is otherwise unable to perform the functions and duties of the office." *Id.* The default rule is that "the first assistant to the office of such officer shall perform the functions and duties of the office temporarily in an acting capacity" when a vacancy occurs. 5 U.S.C. § 3345(a)(1); *see SW General*, 580 U.S. at 293; *Cuccinelli*, 442 F. Supp. at 7. That default applies unless the President (and only the President) invokes one of the FVRA's two alternatives: (1) designating a Senate-confirmed officer already serving in another PAS role, § 3345(a)(2), or (2) selecting a senior agency officer or employee with at least 90 days of service preceding the vacancy, § 3345(a)(3). *See SW General*, 580 U.S. at 295-96; *Cuccinelli,* 442 F. Supp. at 7; *Hooks ex rel. NLRB. v. Kitsap Tenant*

14

*Support Servs.*, 816 F.3d 550, 557 (9th Cir. 2016); *Guedes v. BATFE*, 920 F.3d 1, 11 (D.C. Cir. 2019).

As the District Court noted, § 3345(a)(1) functions as a simple "if-then" rule, where the triggering condition (*i.e.*, a vacancy) automatically results in the first assistant assuming the acting role. Appx63-64. The Government resists this straightforward reading, claiming that because a vacancy is a "continuing state," the present-tense phrasing ("is … unable") allows a later-designated first assistant to qualify, especially since the statute does not explicitly say that it applies to the first assistant "*at the time the vacancy arose.*" Govt. Br., 18-21. These arguments are unpersuasive.

By its plain language, § 3345 (a)(1) applies only to the person serving as first assistant at the moment the vacancy arises. Its present-tense phrasing makes the provision self-executing: if a vacancy occurs, then the first assistant "shall perform" the functions and duties of the vacant office. It does not follow that anyone appointed later qualifies as "the first assistant."

Congress's use of the definite article in the text confirms this interpretation. "*[T]he* first assistant" clearly refers to the deputy already in place at the time the vacancy arises. Had Congress intended otherwise, it would have used "*a* first assistant" instead. Nor do *Dole Food* or *Nichols* support the Government's reading; properly understood, those cases suggest that present-tense phrasing derives

meaning from a statute's specific structure and purpose, not from any generalized grammatical rule of statutory interpretation.[2]

The Government also claims that the phrase "the first assistant to the office of such officer" broadens eligibility to anyone later appointed as first assistant to the office, rather than the first assistant already in that role at the time the office becomes vacant. Govt. Br., 18-19. The more sensible reading is that § 3345(a)(1) refers to the "first assistant" to the office as opposed to a personal assistant or aide to the departed officer. This interpretation is confirmed by the legislative history. As Senator Fred Thompson, a principal author of the FVRA, explained, the phrase "first assistant to the office" was intended to "*depersonalize* the first assistant" while preserving the traditional meaning of that term. 144 Cong. Rec. S12822 (Oct. 21, 1998) (statement of Sen. Thompson) (emphasis added)[3]. In other words, it was a stylistic clarification, not a license for creative post-vacancy shuffling of personnel.

---

[2] *Dole Food Co. v. Patrickson*, 538 U.S. 468, 478 (2003), tied the phrase "is owned" in § 1603(b) to the jurisdictional rule that corporate status is measured at filing, not to a free-floating grammatical canon. *Nichols v. United States*, 578 U.S. 104, 109–10 (2016), read SORNA's present-tense verbs—"resides," "is an employee," "is a student"—as context-specific limits on ongoing duties. Neither case supports the Government's position. The D.C. Circuit has already described a similar argument—albeit in a different context—as "not…compelling." *Belhas v. Ya'alon*, 515 F.3d 1279, 1285–86 (D.C. Cir. 2008).

[3] *See Corely v. United States*, 556 U.S. 303, 318 (2009) ("[A] sponsor's statement to the full Senate carries considerable weight.").

Likewise, although § 3345(a)(1) does not expressly say that the first assistant must be in place "at the time the vacancy arose," it also does not explicitly authorize an agency head to create or re-designate a first assistant *after* the vacancy arises and then treat that individual as the automatic acting official.  Yet that is exactly what the Government asks this Court to endorse.  Even more troubling, the "vacancy" here was not a vacancy at all, but one contrived by the Trump Administration through Ms. Habba's strategic resignation from her interim appointment and immediate redesignation as "First Assistant."[4]  Such a reading would transform § 3345(a)(1) from a narrow, self-executing default into a malleable tool of executive preference.  Chief Judge Brann recognized as much, observing that "if the President may simply name anyone as the first assistant at any time and thereby vest them with acting powers, the[] limitations on acting service are rendered entirely irrelevant." Appx66.

---

[4] § 3345(a)(1) addresses genuine vacancies in PAS offices caused by the incumbent's death, resignation, or inability to serve—not manufactured openings produced through musical-chairs maneuvering.

Additionally, the Government's reliance on *NLRB v. Noel Canning*, 573 U.S. 513 (2014) in support of its assertion that a vacancy in a PAS office is "a continuing state" is misplaced.  *Noel Canning* addressed recess appointments under the Constitution, not the FVRA.  The Supreme Court's observation that some vacancies may "continue" into a Senate recess does not alter the FVRA's clear mandate that "the first assistant" must be in place when the vacancy arises.  To stretch the "continuing" vacancy discussion in *Noel Canning* into this context would effectively rewrite the FVRA into a discretionary appointment mechanism that Congress did not enact.

The Government's position is further undermined by how subsection (a)(1) fits within the structure of § 3345 and the FVRA as a whole. This contextual analysis was central to Chief Judge Brann's rejection of the Government's argument below[5]. Appx62-69. If an agency could treat a vacancy under the FVRA as a flexible state to be filled at any later point by installing a new "first assistant," then the elaborate safeguards in subsections (a)(2), (a)(3) and (b)(1) collapse into irrelevance. Those provisions were designed by Congress to cabin presidential discretion in temporary appointments, ensuring that the FVRA remains a limited exception to the Senate confirmation process—not an invitation to circumvent it. *See* Stephen Migala, *The Vacancies Act and a Post-Vacancy First Assistant of USCIS*, 18–19 (Sept. 19, 2019), https://ssrn.com/abstract=3450843   These structural constraints confirm that the default, automatic succession rule in § 3345(a)(1) applies only to the person serving as first assistant when the office becomes vacant. Incumbency ensures that the (a)(1) default designee has the requisite experience with the office's operations to maintain continuity until the Senate confirms a permanent appointee.

---

[5] *See also United States v. Garcia,* Case Nos. 2:25-cr-00240-GMN-BNW, 2:25-cr-00227-DGC-BNW, 2:25-cr-00240-DGC-BNW & 3:25-cr-00026-DGC-CLB, 2025 U.S. Dist. LEXIS 194389, at *13-33 (D. Nev. Sept. 30, 2025) (Campbell, J.) (adopting Chief Judge Brann's contextual reasoning in *Giraud* and reaffirming that § 3345(a)(1) applies only to the first assistant serving at the moment the vacancy arises).

The Government's discussion of §§ 3345(a)(3)(A) and (b)(1)(A) highlights the very structural logic it seeks to avoid. Relying on *Russello v. United States*, 464 U.S. 16, 23 (1983), the Government argues that the "backward-looking language" found in § 3345(a)(3) (requiring that a President's designee must have served as a senior officer or employee of the agency for at least 90 of the 365 days before the vacancy) and § 3345(b)(1)(A) (prohibiting a nominee from serving as Acting *unless* that individual "served as first assistant" for at least 90 days during the year preceding the vacancy) suggests that Congress's omission of similar limiting language in § 3345(a)(1) allows a first assistant to qualify at any time during the vacancy. But that reasoning misapprehends how § 3345(a)(1) functions.

Unlike §§ 3345(a)(2) and (a)(3), which empower the President to select from a limited pool of candidates, (a)(1) operates automatically (the first assistant "*shall* perform" the duties upon the vacancy). The Executive has no role in triggering this succession. *See* Appx65; *see also SW General,* 580 U.S. at 304-305 (explaining the FVRA contains "mandatory language" for "first assistants who automatically assume acting duties under (a)(1)"). By contrast, the backward-looking limits in subsections (a)(2) and (a)(3) exist precisely because those provisions confer discretionary appointment authority on the President. They ensure that the pool of potential designees is confined to officials with sufficient experience and seniority. *Cuccinelli*, 442 F. Supp. 3d at 28.

Viewed in this light, the differences between § 3345(a)(1) and §§ 3345(a)(2)–(a)(3) do not aid the Government. They confirm instead that Congress intended (a)(1)'s automatic succession to attach only to the incumbent first assistant at the moment of vacancy, without additional qualifiers, because the provision does not depend on presidential discretion. *See* Appx65-66.

Moreover, as Chief Judge Brann recognized, Congress enacted § 3345(a)(3) to solve a specific problem; namely, providing a tightly limited fallback where no first assistant exists at the time of vacancy (or the pool of PAS officers was thin), such as during presidential transitions. Appx70. Treating a vacancy as a "continuing state," as the Government proposes, so that a hand-picked latecomer can be named "first assistant" and elevated to acting service under § 3345(a)(1), would render (a)(3) superfluous. If agencies could simply invent or re-designate a first assistant after the fact, (a)(3)'s safeguards (i.e., GS-15 status, prior service, strict time limits) would serve no purpose. *See Cuccinelli*, 442 F.3d at 28. Thus, the Government's theory collapses (a)(1) into a limitless appointment power, nullifies the safeguards in (a)(2) and (a)(3), and flatly disregards Congress's design. *See SW General,* 580 U.S. at 293-94 (explaining that § 3345 creates three exclusive categories).

Section 3345(b)(1) points in the same direction. As the Supreme Court has made clear, § 3345(b)(1) applies to *all* acting officials serving under (a)(1), (a)(2), or (a)(3), (*see SW General*, 580 U.S. at 293-94), and thus presumes the first assistant

was already in place before the vacancy.  To read subsection (a)(1) as permitting post-vacancy designations would make (b)(1) incoherent, because a post-vacancy first assistant could never satisfy the 90-day pre-service requirement.

Thus, the District Court correctly held that allowing new first assistants to become acting officials under § 3345(a)(1) would render the limits in §§ 3345(a)(2) and (a)(3) largely superfluous. *See* Appx.63-67.

Nevertheless, the Government persists on appeal, arguing that its expansive interpretation of § 3345(a)(1) does not render subsections (a)(2) and (a)(3) superfluous because those provisions would still apply in limited circumstances, such as when both the primary office and the first assistant position are PAS offices that happen to be vacant. Govt. Br., 22.  Both the District Court, (Appx65-67), and Judge Campbell in *Garcia* properly rejected this argument, (*see* 2025 U.S. Dist. LEXIS 194389, at *15-16) ("The government provides no indication of how often this hypothetical scenario might arise, but it seems likely to be rare. The Court should avoid a construction that makes subsections (a)(2) and (a)(3) largely insignificant.") (citing *TRW, Inc. v. Andrews*, 534 U.S. 19, 21 (2001); *Duncan v. Walker*, 533 U.S. 167, 174 (2001)).

The Government offers another hypothetical to defend its reading, *i.e.*, that "[s]ubsections (a)(2) and (a)(3) also play a distinct role when the President wants to leave the current first assistant in place and appoint someone else to be the acting

officer." Govt. Br., 22.  But, again, that scenario would be exceedingly rare and would render the statutory text "dormant in all but the most unlikely situations." *See Garcia*, 2025 U.S. Dist. LEXIS at 194389, *16 (citing *TRW Inc.*, 534 U.S. at 31).

The Government's reliance on "longstanding Executive Branch practice" fares no better.  It asserts that administrations of both parties have frequently appointed new first assistants on Inauguration Day and then treated them as automatic acting officials under § 3345(a)(1). *See* Govt Br., 20 (Appx278, 326).  This argument is both misdirected and self-defeating.

It is misdirected because the fact that prior administrations may have occasionally ignored statutory or constitutional requirements does not validate those actions. *See SW General, Inc.*, 580 U.S. at 317–18 (rejecting the argument that executive practice and congressional silence can legitimate departures from the FVRA's text); *cf. id*. at 323 (Thomas, J., concurring) (it is "irrelevant" that the encroached-upon branch approves the encroachment) (internal citation and quotation marks omitted).  The proper response to years of questionable executive practice is not to contort the FVRA to accommodate the practice, but to enforce the statute as written. *See* Appx74. Under that statute, because Ms. Habba was not the first assistant when the vacancy arose, she did not meet the FVRA's criteria for acting service and thus cannot lawfully serve under § 3345(a)(1).  The Government's argument is also self-defeating because Congress enacted the FVRA to prevent

precisely these kinds of executive end-runs around the Senate's advice-and-consent function (discussed, *infra*).

Further seeking to support its flawed reading of the FVRA, the Government extensively relies upon opinion letters from the DOJ own Office of Legal Counsel ("OLC") and the General Accounting Office ("GAO"). Govt. Br., 20-21, 24. However, the Government's reliance on the cited OLC and GAO opinions is misplaced.  As Judge Campbell recognized in *Garcia*, neither OLC nor GAO is charged with administering the FVRA, and their pronouncements are owed no judicial deference. *See* 2025 U.S. Dist. LEXIS at 194389, *14 (citing *Hooks v. Kitsap Tenant Support Servs., Inc.*, 816 F.3d 550, 564 (9th Cir. 2016)); *Gonzales v. Oregon*, 546 U.S. 243, 257 (2006) (rejecting deference to Attorney General's interpretation of a statute outside his expertise); *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 519-20 (2018).  Notably, the OLC and GAO have reached conflicting conclusions at different times. *Id*. (citations omitted); *see also* Appx67, n.169.  As the Supreme Court has noted, such oscillation undermines persuasive force. *Id*. (citing *Kisor v. Wilkie*, 588 U.S. 558, 579 (2019) (deference is "rarely" appropriate when an agency's current view conflicts with its prior one)).  More fundamentally, courts do not owe deference to agency interpretations of statutes. *Id*. (citing *Loper Bright Enters., Inc. v. Raimondo*, 603 U.S. 369 (2024)).

Ultimately, Congress itself provided the clearest answer to the question presented here in the FVRA's robust legislative history. The FVRA was passed in 1998 as a direct response to decades of Executive Branch attempts—most notably by the DOJ[6]—to use delegation statutes to bypass Senate confirmation and install temporary officials without limitation. *See* Appx69-72, 83; *see also Garcia*, 2025 U.S. Dist. LEXIS 194389, at *27-33. Both the Senate Report and the Minority Views make clear that subsection (a)(1) covers only the first assistant in place when the vacancy arises. S. Rep. No. 105-250, at 14-15, 34. Floor debates echoed the same understanding. *See* 144 Cong. Rec. S11037 (Sept. 28, 1998) (statement of Sen. Joseph Lieberman) ("a first assistant … can take over only if he or she was the first assistant at the time of the vacancy"); *id*. at S11024 (statement of Sen. Robert Byrd). No contrary view appears anywhere in the legislative record, and the Clinton Administration itself accepted this reading. Because both the majority and minority reports agreed, Congress understood that it was prohibiting post-vacancy designations of first assistants when it enacted the FVRA.

The Senate Report's discussion of § 3346 is further illuminating. That section, which governs the duration of acting service, applies to all categories in § 3345. Without it, no acting official identified in § 3345 could lawfully serve. The Senate

---

[6] *See* Stephen Migala, *The Vacancies Act and Post-Vacancy First Assistant of USCIS* (hereinafter, "*Post-Vacancy*"), SSRN, (Sept. 19, 2019) at 6-11, available at https://ssrn.com/abstract=3450843 (last visited October 6, 2025)

Report emphasized that the final version preserved language limiting acting service to those "originally eligible," reinforcing that eligibility is fixed at the vacancy's outset. S. Rep. No. 105-250, at 15.   Congress further explained that automatic succession was justified because the first assistant would ordinarily be a career official familiar with the office or a Senate-confirmed deputy. *Id*. at 12.   Thus, Congress contemplated "that one person" who was already in place—not a pool of interchangeable designees. *Id*.; *see* Appx70, n.182.

The legislative history also underscores the FVRA's structural design. Section 3345(a)(1) was intentionally meant to ensure continuity through an automatic, self-executing mechanism that required no presidential intervention, unless the President invoked one of the FVRA's narrow alternatives found in subsection (a)(2) or (a)(3).[7] As discussed, allowing an agency head to appoint a new "first assistant" after the vacancy opens would render those carefully drawn alternatives superfluous and create a loophole large enough to swallow the FVRA's constraints.   Congress very clearly struck a deliberate balance between operational continuity and preservation of the Senate's advice-and-consent role. *See* S. Rep. No. 105-250, at 12.   The Government's interpretation of the FVRA would upend that balance.

---

[7] If no first assistant exists at the time of the vacancy, the office remains vacant unless the President invokes § 3345(a)(2) or (a)(3), or a nominee is otherwise confirmed. *See* S. Rep. No. 105-250, at 5, 12, 29.

Accordingly, the District Court correctly held that Ms. Habba's post-vacancy designation as First Assistant did not satisfy the FVRA. In doing so, the court recognized that § 3345(a)(1) "provides a default rule that automatically promotes someone (the current first assistant) to be the acting officer without a break in service and without action by the President." Appx63, n.155 (citations omitted). By holding that the only official who is eligible for acting service under § 3345(a)(1) is the incumbent first assistant or deputy when the vacancy arises, the court adhered to the statute's text and the canon of constitutional avoidance—construing the FVRA in a manner that prevents serious Appointments Clause concerns. The Government's contrary reading—that a new administration can designate anyone it chooses as "first assistant" *after* a vacancy and thereby elevate them to Acting U.S. Attorney under the FVRA—finds no support in the statutory language and would allow administrations of both parties to evade the Senate's advice-and-consent role through clever personnel moves. Allowing the Executive to subvert the default line of succession through post-vacancy appointments would resurrect the very "end-run" tactics Congress sought to eliminate. *Garcia*, 2025 U.S. Dist. LEXIS 194389, at *33.

In addition to the clear legislative history, multiple courts have either affirmatively recognized or leaned towards the idea that § 3345(a)(1) applies only to the person serving as first assistant at the time of the vacancy. *See SW General, Inc. v. NLRB*, 796 F.3d 67, 76 (D.C. Cir. 2015) ("Although we do not decide its meaning

26

today, subsection (a)(1) may refer to the person who is serving as first assistant when the vacancy occurs"); *Cuccinelli*, 442 F.Supp.3d 1 (holding that the creation of a new deputy position after a vacancy violated the FVRA); *Williams v. Phillips*, 360 F. Supp. 1363, 1370 n.11 (D.D.C. 1973) (explaining that the Vacancies Act's default rule applies only to the first assistant in place at the time of the vacancy); *United States v. Garcia,* 2025 U.S. Dist. LEXIS 194389 (same); *see also* Appx.63, n.155 (collecting cases). Thus, the District Court's decision here is not an aberration but a principled application of the statute in line with congressional intent.

The Government laments that this view of the FVRA could hamstring new Presidents by forcing them to rely on holdovers or unwanted deputies in the early days of an administration. But such practice-based objections cannot override clear statutory limits. As Chief Judge Brann explained, "[a] government operating by handshake and mutual understanding may go along swimmingly, but only for so long as everyone is willing to play by the rules." Appx74. When that informal accommodation breaks down, "recourse to the law—with no atextual exceptions— provides the only answer." *Id*. Congress deliberately chose to constrain the President's flexibility to preserve checks and balances. It also anticipated the challenge of vacancies at the start of a new administration and accounted for it: the FVRA extends the permissible period of acting service during transitions and allows new Presidents to use the § 3345(a)(2) or (a)(3) mechanisms to bring in their own

personnel, subject to statutory conditions.  What Congress did *not* do was give carte blanche to ignore the default rule by creating "first assistants of convenience."  The statute was designed to ensure continuity in government, while providing incentive for new administrations to start the appointment process without delay.

Taken together, the FVRA's text, structure, and legislative history compel a single conclusion: the First Assistant must be the incumbent at the time of vacancy.  If there is no such incumbent, the office remains vacant until the President lawfully designates an acting under (a)(2) or (a)(3).  Agencies cannot backfill the first-assistant role post-vacancy to manufacture automatic acting authority.  Here, it is undisputed that the vacancy arose upon the resignation of Philip Sellinger on January 8, 2025.  At that moment, Vikas Khanna—not Alina Habba—was First Assistant and thus became Acting U.S. Attorney by operation of law.  It was only after Ms. Habba's interim appointment under 28 U.S.C. § 546 failed to result in her being appointed by the district court that the Attorney General sought to parachute her into the line of succession.  But the FVRA does not allow the Attorney General to conjure a new first assistant after the fact to trigger automatic acting service.  Because Ms. Habba was not First Assistant on January 8, 2025, when Sellinger resigned, she cannot serve under § 3345(a)(1).

For these reasons, the District Court's ruling was correct and should be affirmed.  That ruling is firmly supported by the statute's text, structure, and the

overwhelming weight of historical evidence about it meaning, while the Government's contrary interpretation would distort the statute and erode the Senate's advice and consent role.

### B. Ms. Habba Cannot Serve as Acting U.S. Attorney Because She Was Previously Nominated For The Position of U.S. Attorney

Even if, *arguendo*, Ms. Habba could be treated as a "first assistant," her service as Acting U.S. Attorney would still be unlawful under the FVRA's nomination disqualification provision. To prevent the Executive from installing its nominee as a *de facto* PAS officer while the Senate considers that same nomination, and thereby usurping the Senate's advice and consent role, Congress built a critical check into the FVRA via § 3345(b)(1). That provision bars any person "who has been nominated to fill a vacant office" from serving as the acting officer for that office, subject to a narrow exception for certain long-tenured First Assistants not relevant here. 5 U.S.C. § 3345(b)(1); *SW General*, 580 U.S. at 299 (affirming that § 3345(b)(1) "prevents a person who has been nominated to fill a vacant PAS office from performing the duties of that office in an acting capacity"). Once a nomination is submitted, the individual cannot lawfully serve as the acting official unless they satisfy the limited exception (which Ms. Habba does not).

In this case, the President nominated Ms. Habba to serve as U.S. Attorney for the District of New Jersey on June 30, 2025, while she was serving as interim U.S. Attorney. *See* Appx32. That nomination, by operation of § 3345(b)(1), rendered her

ineligible for further acting service.  The subsequent withdrawal of her nomination on July 24, 2025, mere hours before Ms. Habba's installation as "Acting" U.S. Attorney, (Appx34), did not cure the disqualification.  Nothing in the FVRA provides a safe harbor for withdrawn nominations.  The statutory prohibition is triggered by the act of nomination itself, and its text contains no mechanism for nullifying that bar through strategic withdrawal.  Allowing the Executive to submit and then withdraw a nomination to retain an unconfirmed nominee in power would create the very mischief Congress sought to foreclose: an administration could bypass the Senate by nominating an individual, and then strategically withdraw that nomination if confirmation falters, all while leaving the unconfirmed appointee in charge of the office—either pressuring or bypassing the Senate all the same and effectively converting the confirmation process into a procedural formality.

Section 3345(b)(1) was aimed at preventing an individual from serving simultaneously as nominee and acting official in a way that undermines the Senate's prerogatives. *See* S. Rep. No. 105-250, at 15.  That concern remains salient whether the nomination is pending or was recently withdrawn to avoid rejection, as occurred here.  In Ms. Habba's case, the sequence of events speaks for itself.  Within hours of the withdrawal of her nomination (which was almost certain to be rejected), Ms. Habba was re-installed as "Special Attorney" and "First Assistant," for the purpose of elevating her to Acting U.S. Attorney under the FVRA.  This maneuver treated

the Senate's advice-and-consent function as an obstacle to evade, rather than an indispensable check on Executive power. The FVRA's text and purpose foreclose such an approach (discussed, *supra*).

The Government's textual parsing—focusing on the present tense "submits a nomination"—is overly semantic and unavailing. Govt. Br., 25-27.[8] The statute's operative phrase, "has been nominated," reflects Congress's intent to treat the fact of nomination as the trigger, not its ongoing pendency. *See SW General*, 580 U.S. at 299, 302-303 (repeatedly characterizing 3345(b)(1) as a "limitation" or "bar" for acting service).

In ordinary usage, if a person "has been nominated" to an office remains so, regardless of whether the nomination is later withdrawn. While the Government correctly notes that this phrase is written in the present perfect tense, it does not support the Government's reading of the statute. Present perfect tense denotes a completed act with continuing consequence, not a transitory or pending state. *See Hewitt v. United States*, 145 S. Ct. 2165, 2171–73 (2025) (distinguishing present perfect from present tense); *Carr v. Saul*, 593 U.S. 83, 92 (2021). Thus, grammatically, once a person *has been nominated*, that fact remains true regardless of whether the nomination is later withdrawn; the event has occurred and continues

---

[8] For the same reasons set forth above, the Government's reliance on *Dole Food* and *Nichols* is misplaced.

to carry legal significance.  Congress's choice of the present perfect therefore reflects an intent to tie disqualification to the fact of nomination itself, not its pendency.  Had Congress meant to limit the prohibition to an *ongoing* nomination, it would have used the present tense ("is nominated") or expressly lifted the bar upon withdrawal. It did neither.

The Government's reading would invert that logic by treating "has been nominated" as if it meant "is currently nominated," collapsing the distinction between completed and ongoing action.  But the more logical reading, consistent with the FVRA's structure and purpose, is that Congress sought to remove any incentive for a "confirm-by-default" strategy—installing the nominee as acting official to pressure Senate approval.  Thus, the statute's text, design, and history all support a finding that once a nomination occurs, the bar attaches and remains in effect for the duration of that vacancy.  The Executive cannot erase the legal consequence of nomination by simply withdrawing it.

Moreover, the Government's claim that the appellees' interpretation creates a "lifetime ban" on prior nominees is a straw man. Govt. Br., 27.  The relevant period is the current vacancy.  Because Ms. Habba was nominated to fill this specific vacancy, she is barred from acting service during its duration.  The equities and separation-of-powers concerns that motivated § 3345(b)(1) thus apply with full force here.  Once the Senate's constitutional role was invoked by her nomination, and

when her nomination foundered (for whatever reason), the Executive could not simply pivot and give her the job on an acting basis. To hold otherwise would make a mockery of the Appointments Clause and the FVRA. Indeed, if a President could repeatedly nominate and withdraw the same individual, an unconfirmed nominee could remain in charge indefinitely—an outcome fundamentally at odds with both our constitutional framework and the FVRA's text and purpose.

Finally, it bears emphasizing that violations of the FVRA are not mere technicalities. The Constitution demands that inferior officers be appointed by constitutionally authorized means. The FVRA represents Congress's carefully calibrated, constitutionally sound mechanism for temporary coverage of vacant PAS offices. When its conditions are exceeded or ignored, the individual purporting to act effectively holds the office without lawful appointment. Because Ms. Habba's assumption of power contravened the FVRA at every step, it is inconsistent with the statute itself as well as the separation of powers the statute was meant to preserve. The proper remedy—as the District Court ordered—is to disqualify her from exercising the powers of the U.S. Attorney's office unless and until she is properly appointed in accordance with the Constitution and governing statutes.

## II.   THE DISTRICT COURT PROPERLY HELD THAT THE ATTORNEY GENERAL MAY NOT DELEGATE TO MS. HABBA THE AUTHORITY TO PERFORM THE FUNCTIONS AND DUTIES THE U.S. ATTORNEY'S OFFICE

Unable to square Ms. Habba's acting service with the FVRA's terms, the Government's fallback argument is that even if Ms. Habba cannot serve as the Acting U.S. Attorney, she may nevertheless exercise *all* of the prosecutorial and supervisory authority of an Acting U.S. Attorney by virtue of the Attorney General's unilateral designation of her a "Special Attorney" and "First Assistant U.S. Attorney." Govt. Brief. 27-49.  This rather remarkable claim was properly rejected by the District Court.

In essence, the Government asserts that Congress's enactment of 28 U.S.C. § 546 and the FVRA is irrelevant, and the Attorney General may select whomever she wants to run any U.S. Attorney's Office, regardless of a lack of advice and consent from the Senate, and regardless of any judicial appointment properly made pursuant to § 546(d).  That is not the law.  As the District Court's well-reasoned opinion amply demonstrates, the FVRA was enacted specifically to prevent presidential administrations from bypassing the Senate's advice-and-consent role for PAS officials.  The District Court correctly held that the exclusivity provision, 5 U.S.C. § 3347, renders the Attorney General's delegation of powers to Ms. Habba unlawful.

### A. THE ATTORNEY GENERAL'S OTHERWISE BROAD SUPERVISORY AUTHORITY DOES NOT PERMIT INSTALLING A "DE FACTO" U.S. ATTORNEY BY DELEGATION

It is not disputed that the Attorney General has broad authority to conduct and supervise litigation and to assign discrete matters to subordinates. *See* 28 U.S.C. §§ 509, 510, 515. But those general provisions do not authorize the Attorney General to populate a vacant PAS office by delegation. Based on the Government's own submissions, the District Court found that the delegation here made Ms. Habba the functional head of the office—"on a level equal to one holding the office in a PAS capacity." Appx80-81. Those unchallenged factual findings fully support the legal conclusion that 5 U.S.C. § 3347(b) bars reliance on §§ 509, 510, and 515 to install a *de facto* U.S. Attorney.

The distinction is fundamental. Section 518 and related provisions permit the Attorney General to step in to, direct, or personally conduct particular cases. It does not follow that she may, by memorandum, convey the entire "suite" of a U.S. Attorney's authorities to a subordinate for the duration of a vacancy. Congress addressed that very scenario in the FVRA and § 546—creating narrow, time-limited pathways with built-in checks (personal presidential action under § 3345(a)(2)-(3) or a short-term Attorney General-designated interim appointment followed, if necessary, by a court appointment under § 546(d)). Allowing the Attorney General to avoid those constraints by relabeling the designee as a "special attorney" or "first

assistant" would swallow the rule Congress wrote to preserve the Senate's advice-and-consent prerogatives.

### B. THE DISTRICT COURT PROPERLY HELD THAT THE FVRA'S EXCLUSIVITY PROVISION, 5 U.S.C. § 3347(a) FORECLOSES THE GOVERNMENT'S DELEGATION THEORY

The District Court correctly held that the FVRA's exclusivity provision set forth in § 3347(a) forecloses the Government's delegation ploy.  Section 3347(a) provides, with certain narrow exceptions, that §§ 3345 and 3346 (which govern who may function as an acting officer during a vacancy in a PAS position and for how long) "are the exclusive means for temporarily authorizing an acting official to perform the functions and duties of any [PAS] office."  One of the exceptions to the exclusivity provision are statutory provisions, like 28 U.S.C. § 546, that "expressly … authorize[] the President, a court, or the head of an Executive department to designate an officer or employee to perform the functions and duties of a specified office temporarily in an acting capacity." 5 U.S.C. § 3347(a)(1)(A).

Importantly, § 3347(b) makes clear that "[a]ny statutory provision providing general authority to the head of an Executive agency … to delegate duties statutorily vested in that agency head to, or to reassign duties among, officers or employees of such Executive agency," does not fall within the exceptions to the FVRA.  Thus, the Attorney General's general supervisory authority does not qualify, and the Government's reliance on 28 U.S.C. §§ 509, 510 and 515 is misplaced.

Confronted with § 3347(b)'s clear text, the Government attempts to avoid its application by again citing isolated instances in which the performance of the functions or duties of a vacant PAS office by executive branch officials went unchallenged. Govt. Br., 30.  Notwithstanding the Government's assertions, the FVRA was enacted primarily to end DOJ's practice of using vesting-and-delegation statutes to circumvent limits on vacancy appointments. *See* S. Rep. 105-250, at 3. For decades, DOJ claimed its organic statutes took precedence over the Vacancies Act of 1868, ch. 227, 15 Stat. 168 (1868) (the "Vacancies Act"), which allowed it to bypass the vacancy limits set forth in that legislation. *Id.* at 3.  Although Congress sought to end this debate through its 1988 revisions to the Vacancies Act[9], DOJ continued to maintain that its vacancy appointments were not covered by the statute. S. Rep. 105-250, at 3.[10]

The issue came to a head in 1997 with the Bill Lan Lee episode.  That year, after the Senate declined to confirm Bill Lann Lee to a PAS office, then-Attorney General Janet Reno appointed him to an internal DOJ position that empowered him

---

[9] *See* Pub. L. No. 100-527, 102 Stat. 2643 (1988)

[10] Because Congress left the Vacancies Act's exclusivity provisions untouched during its 1988 amendments, the DOJ continued to disregard the statute's limits.  This persistence was partly driven by the practical reality that few individuals had standing to challenge such appointments in court. Indeed, internal DOJ communications reflected an awareness of this issue, and certain acting officials, whose service plainly violated the Vacancies Act, were advised to avoid taking any action that could create a justiciable controversy or provide a basis for judicial review. *See* Migala, *Post-Vacancy*, at 10-11, fn. 35, 36.

to perform the functions and duties of that same office for which his nomination failed. *See* original sources cited in Migala, *Post-Vacancy*, at 6, 11-12, 30.

This circumvention of the Vacancies Act outraged Senator Thurmond, then-Chairman of the Senate Judiciary Committee, who sent a formal letter to Attorney General Reno on January 23, 1998, declaring Lee's acting service unlawful under the Vacancies Act and warning that such designation undermines the Senate's constitutional role of advice and consent. *See* Letter from Sen. Strom Thurmond to Att'y Gen. Janet Reno (Jan. 23, 1998), reprinted in *Oversight of the Implementation of the Vacancies Act: Hearing on S. 2176 Before the S. Comm. on Governmental Affairs*, 105th Cong. at 125-27, available at https://babel.hathitrust.org/cgi/pt?id=uc1.b5142566&seq=129[11]; *see also* Migala, *Post-Vacancy*, at 30. In the wake of that controversy, Senator Thurmond co-sponsored the legislation that later became the FVRA, aimed at restoring congressional control over acting appointments and foreclosing the use of "housekeeping" statutes to make vacancy appointments. Migala, at 30-31.

Section 3347(b) of the FVRA now codifies that directive, providing that "[a]ny statutory provision providing to the head of an Executive agency … to delegate duties statutorily vested in that agency head to, or reassign duties among,

---

[11] Senator Thurmond's letter expressly asserted that "Mr. Lee[] could not be designated as first assistant after the office was vacant," underscoring Congress's view that first assistant status must exist *at the time* the vacancy arises.

officers or employees of such Executive agency, is not a statutory provision …" exempted from the § 3347(a) FVRA exclusivity provision. 5 U.S.C. § 3347(b). The Senate Committee explained that "[t]his provision forecloses the argument raised by the [DOJ] that sections 28 U.S.C. §§ 509 and 510, rather than the Vacancies Act, apply to vacancies in that department." S. Rep. 105-250, at 17; *see also* 144 Cong. Rec. S6413 (June 16, 1998) (statement of Senator Thompson introducing the FVRA and why the bill was needed). The District Court applied that history and text to reject the very theory the Government advances here. *See* Appx72, 83. This recycled "delegation" theory—previously rejected by both Congress and the District Court— should be rejected again.

As Senator Thompson unequivocally stated during the FVRA's passage: *"There is no question that the vesting and delegation statutes do not constitute provisions for the temporary appointment of specific officers." See* 145 Cong. Rec. S33 (Jan. 6, 1999) (statement of Sen. Thompson). The FVRA "expressly repudiates" the notion that an agency head's general power to assign duties can be used to fill a high-level vacancy. 144 Cong. Rec. S6414 (June 16, 1998) (statement of Sen. Thompson). Simply put, DOJ's internal delegation authority cannot override the specific vacancy-filling scheme that Congress has established for U.S. Attorneys. *See* 28 U.S.C. § 541 *et seq*.

The recent opinion by the Honorable David G. Campbell, Senior United States District Judge, in *Garcia* is in full agreement with Chief Judge Brann's legal conclusions and with Congress's intent. *See* 2025 U.S Dist. LEXIS 194389.  There, like here, the Attorney General appointed Sigal Chattah as interim U.S. Attorney for the District of Nevada under 28 U.S.C. § 546(a). *Id*. at *3.  Before the 120-day interim term expired—when the district court otherwise could have appointed an interim successor under § 546(d)—Ms. Chattah resigned from her position, and the Attorney General immediately designated her First Assistant U.S. Attorney, purporting to authorize her to continue as Acting U.S. Attorney under the FVRA. *Id*.

The defendants in that case moved to dismiss their indictments, challenging the legitimacy of Ms. Chattah's appointment. *Id*. at 3.  After carefully analyzing the text, structure, and legislative history of the FVRA, Judge Campbell concluded that the automatic ascension rule under § 3345(a)(1) applies only to the first assistant serving when a vacancy initially arises. *Id*. at 33.  As here, the Government in *Garcia* argued that the Attorney General properly delegated to Ms. Chattah the power to supervise criminal prosecutions in that district pursuant to §§ 509, 510, and 515.  Judge Campbell rejected that contention, noting that the argument "runs headlong into the exclusivity provisions of the FVRA." *Id*. at 33-34.

Faced with the plain language and legislative history of § 3347(b), the Government attempts to narrow its long-asserted delegation theory. Govt. Br., 33.  It

now concedes that the FVRA bars reliance on DOJ's general vesting-and-delegation statutes to appoint an *acting* officer, but claims the statute does not prevent the Attorney General from empowering a non-acting subordinate to perform "delegable" duties. Govt. Br., 34-35.    In other words, the Government now maintains that the FVRA's exclusivity provision is limited to the nondelegable functions and duties of a PAS Office. *Id*.  From this faulty premise, the Government has asserted that the Attorney General may delegate her "remaining" functions to Ms. Habba as a "Special Attorney," thereby permitting her to run the New Jersey U.S. Attorney's Office.  This argument fails both factually and legally.

First, even assuming *arguendo* that a delegable/nondelegable distinction mattered under the FVRA's exclusivity provision, the Government never drew any such distinction when describing the scope of Ms. Habba's authority.  To the contrary, it told Chief Judge Brann that "Ms. Habba can do *anything* the United States Attorney can do." Appx175. (emphasis in original), quoted in Appx80.  Chief Judge Brann found, after careful review, that "the Government intends for its delegation to confer upon Ms. Habba the full panoply of powers of a PAS United States Attorney." Appx95.  The Government refused to identify which of those duties were supposedly "exclusive" or "nondelegable." *See* Appx324-331; Appx79.  Indeed, its own theory "does not appear to embrace the idea that a United States Attorney has *any* exclusive powers." Appx79, n.210 (emphasis in original) (citing

28 U.S.C. § 510). Having expressly delegated "the full suite of a United States Attorney's statutory duties," (*id*.), the Government cannot now claim that this distinction between delegable and nondelegable functions and duties apply to Ms. Habba's appointment.

Second, the Government's argument fails as a matter of law. Nothing in DOJ's vesting (§ 509), delegation (§ 510), or succession (§ 508) statutes draws a line between delegable and nondelegable duties relevant to FVRA applicability. To the contrary, §§ 509 and 510 are the very provisions Congress identified as problematic when it enacted the 1998 FVRA amendments. S. Rep. No. 105-250, at 1. The Government conceded below that "the FVRA applies and that § 3347(b) forecloses the use of general delegation statutes to designate [acting officials]." Doc. Appx392 (emphasis in original) (quoted in Appx79, n.222). Although § 508 appears among the forty-one office-specific succession statutes exempted from the FVRA, the Government does not rely on it here. Nor was § 515—its primary delegation statute—ever listed as an exempt succession statute in the 1998 amendments. S. Rep. No. 105-250, at 17.

Finally, the delegation distinction arises only in § 3348, not § 3347. Section 3348(a)(2) defines "functions or duties" as those "required by statute to be performed by the applicable officer (and only that officer)," but that definition applies "[i]n this section" alone. 5 U.S.C. § 3348(a). Both Chief Judge Brann and

Judge Campbell correctly concluded that the phrase has no bearing on § 3347's exclusivity provision. *See* Appx87-89 (*distinguishing Kajmowicz*, 42 F.4th at 148)(noting that this Court interpreted § 3348 and never mentioned § 3347); *Garcia*, 2025 U.S. Dist. LEXIS 194389, at *36. Judge Campbell explained that limiting § 3347(b) to nondelegable duties would "make no sense," since the provision itself addresses "delegable duties—the duties an agency head can delegate to subordinates." *Id.* If confined to non-delegable tasks, § 3347(b) would be "meaningless, even nonsensical." *Id.*

Congress enacted the FVRA as the "exclusive means" for authorizing acting service in PAS offices absent another statute that expressly provides a temporary-filling mechanism. 5 U.S.C. § 3347(a). For U.S. Attorneys, that companion statute is § 546. Nothing in § 546—or elsewhere—authorizes the Attorney General to bypass both the FVRA and § 546 by delegating the entire office's powers to an unconfirmed subordinate. Congress was well aware that agency heads could reassign duties among subordinates; it crafted § 3347(b) precisely to close that loophole. The Senate Report acknowledged that while certain "delegable functions" may be performed by others, the FVRA remains the exclusive framework for temporarily filling the office itself. S. Rep. No. 105-250, at 17. An agency cannot simply label someone a delegate and thereby transfer the full powers of a vacant office without invoking the FVRA or another express succession statute.

The cases the Government cites do not support its theory. Govt. Br., 37-40. Some appellate decisions have observed that FVRA's prohibition on unauthorized acting service extends only to the nondelegable duties of an office. *See, e.g., Arthrex v. Smith & Nephew, Inc.*, 35 F.4th 1328, 1336 (Fed. Cir. 2022) (explaining that § 3348(d) invalidates only those actions involving duties that, by law, may be performed solely by the designated officer); *Kajmowicz v. Whitaker*, 42 F.4th 138, 148 (3d Cir. 2022) (explaining that § 3348's remedial limitation applies only to acts involving functions that, by statute, must be performed personally by the specified officer).  But that principle governs § 3348's remedy—not § 3347's exclusivity. Preserving routine operations (e.g., a staff attorney filing a motion) is not a license to confer the full mantle of leadership on someone who is not a valid acting officer. Even the Government's authorities recognize that delegations cannot be used to evade vacancy limits. *See Hooks*, 816 F.3d at 557 (statutes must not be read in a way that renders the FVRA "inoperative"); *Gonzales & Gonzales Bonds & Ins. Agency, Inc. v. DHS*, 107 F.4th 1064, 1078 (9th Cir. 2025) (expressly distinguishing what § 3348 reaches); *Kajmowicz*, 42 F.4th 138, 148-49 (delegability cannot be used to sidestep the FVRA's penalty but also shows where penalty attaches).  The Government's reading would allow the indefinite exercise of office-wide power by a non-acting designee based only on a delegation memo.  This would turn the FVRA's exclusivity and time limits on its head.

Legislative history supports the District Court's view that delegations cannot be used to override the FVRA. The Senate Report emphasizes that once a vacancy arises, the bill provides an exclusive set of options for filling it; a general delegation is not among them, and Congress repudiated DOJ's prior reliance on §§ 509–510 to ignore the Vacancies Act. *See* S. Rep. No. 105-250, at 17; 144 Cong. Rec. S6414 (June 16, 1998). The Government's position—that titles do not matter and delegation suffices—is precisely the artifice Congress sought to eliminate. Where one reading raises serious constitutional problems (such as the unchecked, indefinite exercise of principal-officer power by an unconfirmed individual), courts should adopt the interpretation that avoids them. *See Jennings v. Rodriguez*, 583 U.S. 281, 316 (2018) (constitutional avoidance is a tool for choosing between competing plausible interpretations of a statutory text, resting on the reasonable presumption that Congress did not intend the alternative which raises serious constitutional doubts); *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Const. Trades Council*, 485 U.S. 568, 575 (1988) (courts construe statutes to avoid serious constitutional problems when a plausible alternative reading exists) (internal citations omitted); *Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 441 (1935) (Brandeis, J., concurring) (courts should not decide constitutional questions when a case may be resolved on statutory grounds). Here, that means affirming that the FVRA and § 546 are the *exclusive* means to staff a U.S. Attorney vacancy, and that

general delegation authority cannot be used to install, in substance, an Acting U.S. Attorney outside those parameters.

It is also notable that once Ms. Habba's lawful interim appointment under § 546 expired, the Executive did not simply leave the office vacant and distribute a few delegable tasks. Instead, it orchestrated a wholesale transfer of operational command to Ms. Habba via simultaneous FVRA designation and broad delegation. This reveals that the goal was to keep Ms. Habba in charge of the office, not merely to assign an isolated duty here or there. And the Government has shown its hand several times by its insistence that the President's sole preference is to have Ms. Habba occupy the office of U.S. Attorney in New Jersey. In other words, the delegation is being used as an extremely thin disguise for an acting appointment, without having to endure the burden of Senate confirmation. Courts are not required to shut their eyes to reality. As the D.C. Circuit recognized in *Doolin Security Savings Bank*, simply labeling someone a "first assistant" or delegate "did not necessarily make him a 'first assistant' entitled to succeed" under the Vacancies Act. 139 F.3d 203 (D.C. Cir. 1998). Likewise, calling Ms. Habba a "Special Attorney" does not change the fact that she is functioning as the head of the U.S. Attorney's Office. The FVRA's exclusivity and enforcement provisions exist to prevent exactly this kind of shell game, and the district court correctly applied them. Any other result would invite agencies to circumvent statutory appointment limits through

46

nominal reassignments, hollowing out the Senate's confirmation power and the FVRA's safeguards.

## **CONCLUSION**

This Court should affirm the judgment of the District Court.

Respectfully submitted,

**LAW OFFICE OF**
**THOMAS S. MIRIGLIANO, ESQ., P.C.**


By: _____/s/_____
　　　　Thomas S. Mirigliano, Esq.
　　　　40 Wall Street, 32nd Floor
　　　　New York, New York 10005


**LAWYERS FOR THE RULE OF LAW**


By: _____/s/_____
　　　　Martin Cronin, Esq.
　　　　Member
　　　　5 Columbus Circle, Suite 1501
　　　　New York, New York 10019



Dated: New York, New York
　　　　October 6, 2025

## <u>CERTIFICATE OF COMPLIANCE</u>

1.      I am a member of the bar of this Court with Bar Number 038542011.

2.      This brief complies with the type-volume limit of the Federal Rules of Appellate Procedure 32(a)(7) because it contains 10903 words.  The brief also complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 32(a) because it was prepared using Microsoft Word in Times New Roman 14-point font.

3.      The text of the electronic version of this document is identical to the text of the hard copies that will be provided.

4.      This document was scanned for viruses with the most recent version of Microsoft Defender Antivirus, which is continuously updated, and according to that program is free of viruses.

Thomas S. Mirigliano